Vernon **MASAYESVA, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on Behalf of the HOPI INDIAN TRIBE, Plaintiff,**

v.

Peterson **ZAH, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on Behalf of the NAVAJO INDIAN TRIBE, Defendant,**

v.

Evelyn **JAMES, et al., Intervenors.**

**No. CIV 74–842 PCT EHC.**

United States District Court, D. Arizona.

April 27, 1992.

Order Amending Findings of Fact June 18, 1992.

See also, 792 F.Supp. 1178.

James E. Scarboro, Alfred T. McDonnell, Mary Gabrielle Sprague, David C. Warren, Arnold & Porter, Denver, Colo., W. Scott Bales, Lawrence A. Hammond, Meyer, Hendricks, Victor, Osborn & Maledo, Phoenix, Ariz., Michael P. O'Connell, General Counsel, Hopi Indian Tribe, Kykotsmovi, Ariz., for plaintiff.

Terry E. Fenzl, Craig Soland, John Rogers, Amy Gittler, Dolph Barnhouse, Peter Osetek, Brown & Bain, P.A., Phoenix, Ariz., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: HOPI CLAIMS

EARL H. CARROLL, District Judge.*

### INTRODUCTION

#### I. *Parties*

Plaintiff Vernon Masayesva is the duly authorized Chairman of the Hopi Tribal Council of the Hopi Tribe, and appears herein as representative of the Hopi Tribe and its villages, clans and individual members.

Defendant Peterson Zah is the duly authorized Chairman of the Navajo Tribal Council, and appears herein as representative of the Navajo Nation[1] and its chapters, clans, and individual members.

Evelyn James is the duly authorized spokesperson of the San Juan Southern Paiute Tribe and appears herein in her representative capacity on behalf of the San Juan Southern Paiute Tribe and its individual members.

---

* I take this opportunity to acknowledge the assistance of Kristen Rosati, my second year law clerk, in research and preparation of this order. She has also been able to devote substantial time towards pretrial issues and the Court's preparation for Phase II in this case.

1. The Navajo Tribal Code, 1 N.T.C. § 301, requires officials of the Navajo Tribe to use the term "Navajo Nation" rather than "Navajo Tribe". Throughout this opinion, the Court will use the term employed by the Navajos.

2. § 640d–7. Determination of tribal rights and interest in land.
   (a) Authorization to commence and defend actions in District Court
   Either tribe, acting through the chairman of its tribal council for and on behalf of the tribe, is each hereby authorized to commence or defend in the District Court an action against the other tribe and any other tribe of Indians claiming any interest in or to the area described in the Act of June 14, 1934, except the reservation established by the Executive Order of December 16, 1882, for the purposes of determining the rights and interests of the tribes in and to such lands and quieting title thereto in the tribes.
   (b) Allocation of land to respective reservations upon determination of interests
   Lands, if any, in which the Navajo Tribe or Navajo individuals are determined by the District Court to have the exclusive interest shall continue to be a part of the Navajo Reservation. Lands, if any, in which the Hopi Tribe, including any Hopi village or clan thereof, or Hopi

#### II. *Background*

In 1974, the Hopi Tribal Chairman commenced this action pursuant to 25 U.S.C. § 640d–7[2] to determine Hopi rights and interests in the reservation created by the Act of June 14, 1934, 48 Stat. 960 (1934) (the "1934 Act"). The 1934 Act described the external boundaries of the Navajo Reservation, and conveyed an equitable interest in certain of these lands to the Navajo Nation and "such other Indians as may already be located thereon."[3]

This lawsuit is the second action between the Navajo and Hopi Tribes to settle title in reservation lands in northeastern Arizona. The rights of the Navajo and Hopi Tribes in a parcel withdrawn by Executive Order on December 16, 1882 ("the 1882 Reservation") were previously litigated in a separate line of cases. *See Healing v. Jones,* 210 F.Supp. 125 (D.Ariz.1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963); *Hamilton v. MacDonald,* 503 F.2d 1138 (9th Cir.1974). Supplementary pro-

---

individuals are determined by the District Court to have the exclusive interest shall thereafter be a reservation for the Hopi Tribe. Any lands in which the Navajo and Hopi Tribes or Navajo or Hopi individuals are determined to have a joint or undivided interest shall be partitioned by the District Court on the basis of fairness and equity and the area so partitioned shall be retained in the Navajo Reservation or added to the Hopi Reservation, respectively.
   (c) Actions for accounting, fair value of grazing, and claims for damages to land; determination of recovery; defenses
   [Omitted].
   (d) Denial of Congressional interest in merits of conflicting claims; liability of United States
   [Omitted].
   (e) Payment of legal fees, court costs and other expenses
   [Omitted].

3. Section 1 of the 1934 Act provides:
   To define the exterior boundaries of the Navajo Indian Reservation in Arizona, and for other purposes ... the exterior boundaries of the Navajo Indian Reservation, in Arizona, be, and they are hereby, defined as follows: [legal description of land omitted]. All vacant, unreserved, and unappropriated public lands, ... within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajos and such other Indians as may already be located thereon ...

ceedings still continue regarding the payment of "owelty" for differences in value of land received, damage to the land partitioned to the Hopi Tribe (the Hopi Partitioned Lands, or "HPL"), and prepartition "use" of the HPL by Navajos. Although the 1882 Reservation litigation is not relevant to the disposition of this lawsuit, the events of that dispute provide background understanding of the Navajo–Hopi land dispute, and may guide this Court in various ways in its decision.

The present case has centered on who were "such other Indians" entitled to assert interests in the 1934 Reservation, which lands in the 1934 Reservation were subject to litigation, and where "such other Indians" were "located" in 1934; these Findings of Fact and Conclusions of Law will determine where "such other Indians" were located. Subsequent to these findings, the Court will conduct a trial regarding partition of the 1934 Reservation pursuant to § 640d–7(b) (Phase II).

### III. *Who are "such other Indians"?*

■ The District Court previously held that the Hopi Indians were "such other Indians": "The Court takes judicial notice that a Hopi village existed at Moencopi on June 14, 1934. Moencopi is within the 1934 Act land grant, and therefore, the Hopi are within the 'such other Indians' clause and are holders of equitable interests." *Sekaquaptewa v. MacDonald,* 448 F.Supp. 1183, 1193 (1978) (hereinafter, *"Sekaquaptewa I"*), *aff'd in part, rev'd in part, Sekaquaptewa v. MacDonald,* 619 F.2d 801 (hereinafter, *Sekaquaptewa II"*), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 565, 66 L.Ed.2d 468 (1980).

The San Juan Southern Paiute Indians (the "Paiutes" or "Paiute Tribe") are also "such other Indians" and holders of equitable interests in the 1934 Reservation. In previous orders, this Court upheld the Department of Interior recognition of the Paiutes as an Indian tribe, and held that

the Court had jurisdiction to determine their interests in the 1934 Reservation as "any other tribe of Indians", pursuant to 25 U.S.C. § 640d–7.[4]

These findings will address only the location of Hopi Indians in 1934; separate findings will be issued regarding the location of the Paiutes in 1934.

### IV. *Which lands are excluded from litigation?*

Certain lands within the boundaries of the 1934 Reservation were expressly exempted from the granting clause of Section 1 of the 1934 Act. These include the 1882 Reservation and certain lands previously reserved by Congress for water power purposes and power sites. Moreover, other lands had been permanently reserved by Congress prior to 1934, and were thus not in dispute, including lands reserved by the 1868 Treaty with the Navajo Nation, 15 Stat. 667 (located in the northeastern corner of the 1934 Reservation), and lands withdrawn by the Act of May 23, 1930, 46 Stat. 378, and the Act of February 21, 1931, 46 Stat. 1204 (both along the western edge of the 1934 Reservation).

Further, allotted lands for which patents issued were excluded from the scope of this litigation pursuant to § 640d–16(a).[5]

The Navajo Nation had argued that other lands were excluded from the scope of the litigation, as well. The 1934 Act conveyed an equitable interest to the Navajos and "such other Indians" on *"vacant, unreserved, and unappropriated public lands"*. The Navajo Nation brought a number of motions for partial summary judgment asking this Court to find that certain lands within the boundaries of the 1934 Reservation were not "vacant, unreserved, and unappropriated", and thus not subject to the claims of the Hopi Indians. The Court held that some of these lands were "unreserved and unappropriated" and thus not subject to Hopi and Paiute claims,

---

**4.** This Court also held that 25 U.S.C. § 640d, *et seq.* did not authorize this Court to partition land to the Paiute Tribe.

**5.** § 640d–16(a) provides:

[N]othing in this Act shall affect the title, possession, and enjoyment of lands heretofore allotted to Hopi and Navajo individuals for which patents have been issued.

including lands purchased on behalf of the Navajo Nation, privately owned lands relinquished pursuant to Section 2 of the 1934 Act, and lands conveyed to the State of Arizona for the "support of the common schools" which were surveyed prior to withdrawal of the land pursuant to Executive Order. Further, the Court held that other lands were "reserved and appropriated" and subject to Hopi claims, including allotted lands for which patents did not issue, and "school lands" which were unsurveyed or surveyed after withdrawal of the land pursuant to Executive Order. The location of these "excluded" lands has not been established; in Phase II of this litigation regarding partition, the parties will have the opportunity to present evidence regarding the location of these lands.

## V. *What is sufficient occupation, possession, or use to create a property interest in the 1934 Reservation?*

The District Court previously held that the interests of the Hopi Tribe in the disputed lands were based on Hopi "occupation, possession, or use" in 1934, and that any Hopi interest was limited to an undivided one-half interest in these lands.[6] *Sekaquaptewa I*, 448 F.Supp. at 1193, 1196. Both parties appealed, and the Ninth Circuit reversed in part "only with respect to the district court's holding that Hopi title is necessarily non-exclusive, even with respect to land that was actually and exclusively 'possessed, occupied, or used' in 1934." *Sekaquaptewa II*, 619 F.2d at 809–810 (1980).

The Ninth Circuit affirmed the District Court's interpretation of the 1934 Act that Hopi interest in the 1934 lands depended on Hopi occupation, possession, or use of the lands on June 14, 1934. The Court stated:

> The purposes, history, and language of the 1934 Act show an intent to withdraw all reservation land for the Navajos except for pockets occupied by Hopis. We agree with the district court that this is

the meaning of the "such other Indians as may already be located thereon" provision. The legislative history discussed by the district court at 448 F.Supp. 1194–96, supports this conclusion.

> \*      \*      \*      \*      \*      \*

> [L]egislative intent is clear enough to enable us to identify Hopi interests by areas settled. Navajo interests are identifiable as the residue. Congress recognized Hopi concern over the 1882 Reservation and their villages, shrines, and grazing areas outside the 1882 reservation. The "such other Indians" provision was explained to the Hopis as protecting their rights to areas occupied outside the 1882 reservation.

> \*      \*      \*      \*      \*      \*

> The Act was not intended to disturb then-existing land tenure patterns.... [and] would not disturb the Hopis' right to occupy the land they were then occupying. This is consistent with the intent of the 1934 Act to preserve a *status quo* and not to disturb existing arrangements.

*Sekaquaptewa II*, 619 F.2d at 807–808.

While it is thus clear that Hopi land use in 1934 would be protected, the courts have not previously decided what types of land use, i.e. "occupation, possession, or use", were sufficient to create a property interest in the 1934 Reservation. The District Court did, however, clarify that "actual occupation" (presumably continual physical presence) was not necessary:

> [T]he Navajo attempt to limit Hopi rights and interest to land actually occupied by the Hopi is misplaced. The 1934 Act protects both Hopi occupancy and land use. For example, grazing land and religious shrines may fall within the scope of the land grant to the Hopi. These issues present a mixed question of law and fact, however, and the Court will not rule at this time on what types of land uses are sufficient to create a property

---

**6.** In summary, the District Court also held: (1) the Hopi Tribal Chairman's representational capacity for the Tribe, villages, clans, and individual members of the Hopi Tribe was proper; (2) the Court had jurisdiction to partition the 1934 lands; (3) no accounting relief was statutorily authorized [prior to the 1980 amendments]; and (4) the previous action brought by the Hopi Tribe before the Indian Claims Commission had no collateral estoppel effect.

interest under the 1934 Act. After discovery, the Court can determine which kinds of Hopi possession or use on June 14, 1934 were substantial enough to create property rights within the area set aside by the boundary bill.

*Sekaquaptewa I,* 448 F.Supp. 1196.

The legislative history of the 1934 Act is sparse, and gives no guidance in determining what land use was substantial enough to create this property interest. A discussion of the legislative history is contained in *Sekaquaptewa I,* 448 F.Supp. at 1193–96 (the "only meaning this clause could plausibly be given in light of the legislative history is to protect the rights and interests of the Hopi tribe to the land they were using and occupying outside the 1882 Reservation on June 14, 1882").

The language and legislative history of the Navajo–Hopi Settlement Act, 25 U.S.C. § 640d–7, is similarly unhelpful. Although the legislative history is replete with discussion regarding whether a legislative or judicial solution to the 1934 Reservation dispute was appropriate,[7] there is no discussion or reference to what type or intensity of land use would be sufficient to create a property interest.

■ The Hopi Tribe urges that the Court determine where Hopis were located with reference to their "traditional practices and modes of life", as interpreted by various Indian Claims Commission and Court of Claims cases adjudicating aboriginal title claims by Indian tribes. The words "use", "occupancy" and "possession" have acquired a special meaning in these cases. For instance, the extent of use and occupancy for aboriginal claims are "determined by [an Indian's tribe's] subsistence *and spiritual* needs", *Swinomish Tribe of*

*Indians v. United States,* 26 Ind.Cl.Comm. 371, 383 (1971) (emphasis added), and include extended areas in which tribes have traditionally hunted and gathered plants. *Zuni Tribe of New Mexico v. United States,* 12 Cl.Ct. 607, 608 (1987); *San Carlos Apache Tribe of Arizona v. United States,* 21 Ind.Cl.Comm. 189, 193 (1969). Significantly, some of these cases have found aboriginal title based on intermittent contact with the land. *United States v. Seminole Indians of the State of Florida,* 180 Ct.Cl. 375, 385 (1967); *Sac v. Fox Tribe of Indians v. United States,* 179 Ct.Cl. 8, 383 F.2d 991, 998 (Ct.Cl.), *cert. denied,* 389 U.S. 900, 88 S.Ct. 212, 19 L.Ed.2d 217 (1967); *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States,* 177 Ct.Cl. 184, 194 (1966).

While understanding traditional practices is important to determine where Hopis were located in 1934, this Court will not apply the same standard regarding the *intensity* of "possession, occupancy, and use" required to establish aboriginal title. The Hopi Tribe's claims in this case are based on *recognized title* granted by the 1934 Act. *Sekaquaptewa I,* 448 F.Supp. at 1187–89. Recognized title arises where Congress has acknowledged a right to permanently occupy and use land, and the subsequent taking of that land is compensable. *Miami Tribe v. United States,* 146 Ct.Cl. 421, 175 F.Supp. 926, 936 (1959). In contrast, claims before the Indian Claims Commission are not based in law, but on Congress' policy decision to provide limited compensation to Indian Tribes for the extinguishment of nonrecognized Indian title. *See,* Felix Cohen, *Handbook of Federal Indian Law,* 1982 ed., p. 492. Intermittent

---

7. *See,* H.R.Rep. No. 92–1221, 92nd Cong., 2d Sess. 8 (1972) (proposed bill [the Steiger bill] would partition 208,600 acres adjacent to the 1882 Reservation to the Hopi Tribe); H.R.Rep. No. 93–909, 93rd Cong., 2d Sess 8–10, 24 (1974) (proposed bill [H.R. 10337] would partition 243,400 acres to the Hopi Tribe; letter from Morris Thompson, Commissioner of Indian Affairs, expressing concern regarding liability to the Navajo Tribe for a taking of Navajo land since no judicial determination of Navajo and Hopi interests in the 1934 Reservation had been

conducted); S.Rep. No. 93–1177, 93rd Cong., 2d Sess. 20, 31–33 (expressed preference for immediate legislative resolution of 1934 lands, and proposed partitioning 243,400 acres of land to the Hopi land); 120 Cong.Rec. H6969–78 (1974); 120 Cong.Rec. S37538–546 (1974); 120 Cong. Rec. S37724–749 (1974) (Senate passes H.R. 10337, with Senator Montoya's amendment providing for a judicial resolution of the 1934 controversy); 120 Cong.Rec. H38758–762 (1974) (House concurred in Senate amendments).

and non-intensive use is not sufficient to establish recognized title.

In fact, the Hopi Tribe's aboriginal claims to approximately three-quarters of the 1934 Reservation were previously adjudicated by the Indian Claims Commission; the Commission held that Hopi aboriginal claims were extinguished by the passage of the 1882 Executive Order withdrawing lands for the Hopi. *Hopi Tribe v. United States*, 31 Ind.Cl.Comm. 16 (1973); *Hopi Tribe v. United States*, 23 Ind.Cl.Comm. 277 (1970). The Hopi Tribe may not have a second chance at establishing its claims of aboriginal use to much of the 1934 Reservation.

■ At the other end of the spectrum, the Navajo Nation urges the Court to adopt a "plain meaning" interpretation of the word "located", and require the Hopi Tribe to demonstrate a "physical presence or existence in a place", or "settlement". Although the Court previously rejected the Navajo attempt to limit Hopi rights and interests to land actually occupied by the Hopi, *Sekaquaptewa I*, 448 F.Supp. 1196, the Navajo Nation now extends their argument to include "those particular parcels that Hopis used regularly for residence or used regularly and intensively for subsistence purposes".

The Court finds that the use by Hopi Indians must be substantial and sufficiently intensive in order to create a property interest in the 1934 Reservation, though the use does not have to be for subsistence purposes. Use by a few isolated individuals, especially when away from traditional use areas of that individual's Tribe, and irregular or sporadic uses are not sufficient. However, since seasonal use is pervasive in Indian land use patterns, and indeed, necessary in the harsh environment of the 1934 Reservation, substantial seasonal use is sufficient for this Court to find occupation or use of the land.

After the areas on which Hopi Indians are located are identified, "Navajo interests are identifiable as the residue." *Seka-*

*quaptewa II*, 619 F.2d at 808. Thus, this Court need only address Navajo use of lands on which the Hopi Tribe has proved Hopis were "located" in 1934, in order to decide whether Hopis were "exclusively" or "jointly" located on that land. If Hopis were exclusively located on an area of land, it will become a part of the Hopi Reservation. If both Navajos and Hopis made use of an area, the area is subject to partition between the Tribes based on "fairness and equity".

### VI. *Hopi claims of exclusive use area based on documentary evidence*

■ Before discussing the evidence presented at trial, the Court will address Hopi claims of an exclusive use area based on documentary evidence and aerial photographs. The Hopi Tribe claims that an 80,000 acre area depicted in Ex. 703A (with the modifications described in Hopi Proposed Finding 57) was used, occupied, and possessed by Hopis in 1934 "to the virtual exclusion of others".

The Hopis argue that certain United States government officials and members of the Navajo Nation "informally acknowledged" that the Hopis intensively used this area "or an approximately similar area" in the 1920's and 1930's. *See* 4 TT 546–65 (Dr. Godfrey). The Hopi Tribe cites Ex. 237 (Letter from C.L. Walker, Superintendent Western Navajo Indian Agency, to H.J. Hagerman, Special Commissioner of Indian Affairs, dated February 5, 1930), describing an informal agreement reached to prevent disputes between Navajo and Hopi stockmen; the Hopis were to graze out of Moenkopi Wash[8] "as far as their stock would naturally graze from the Village" and the western edge of "the mesa" was agreed to be the western boundary. However, this letter does not explicitly state what the boundaries were and the letter notes the boundaries were not always observed by members of either Tribe. The letter does not support the conclusion that

---

**8.** The Hopis use the spelling "Moenkopi"; some government documents and previous court decisions utilized the spelling "Moencopi".

this entire area was exclusively used by Hopis.

Second, Hopi expert Ronald Wright analyzed United States Soil Conservation Service ("SCS") aerial photographs taken in 1934 (the "Fairchild aerial photographs" or "aerial photographs") for cultural features or disturbances such as fields, corrals, structures, or trails. The Hopi Tribe contends that all of these cultural features were examined on the ground by Hopi expert Dr. Charles Adams, and that *all* of these cultural features were Hopi, as supported by physical evidence and testimony.

However, Dr. Adams did not express an opinion regarding whether Hopi use of the area was *exclusive*. Dr. Adams admitted that he did not seek out Navajo sites in the area and that Mr. Hamana (a Hopi tribal employee assisting Dr. Adams) and Dr. Fritz (an anthropologist assisting Dr. Adams) did not take him to examine sites they suspected were Navajo. 8 TT 1215 (Dr. Adams). Further, Hopi counsel stated in closing:

> I would like to say a word on the issue of a Hopi exclusive use area. The Court may have noticed that nowhere in the Hopi Tribe trial memorandum or its opening statement, was a claim made for a particular exclusive use area, nor did Dr. Adams in his testimony make such a claim.
>
> The most Dr. Adams could do was to describe Hopi use, based upon archeological remains, but he was not in a position, nor is the Hopi Tribe, to state that there was no Navajo or Paiute use of areas at some distance from the Village.

14 TT 2113 (Mr. Scarboro).

Neither the document cited nor the aerial photographs conclusively establish that this 80,000 acre area was exclusively Hopi, and the Court will therefore examine the evidence presented at trial regarding Hopi and Navajo use of the 1934 Reservation. The location of residences, farming, grazing, and other traditional uses will be evaluated.

**FINDINGS OF FACT**

I. *Residence*

The Hopi have for centuries lived in villages located on First, Second, and Third Mesas within the 1882 Reservation. Additionally, in 1934 about 400 Hopis lived within the borders of the 1934 Reservation at the Village of Moenkopi. The Hopi Tribe also claims that Hopis had seasonal field and ranch houses outside of Moenkopi in 1934 in the areas of Moenkopi Wash, Ward Terrace, the Moenkopi Plateau, the Bakalo, the Little Bakalo, Coal Mine Mesa, and other miscellaneous areas.

Because Dr. Adams indicated that Hopi residences away from the villages were usually associated with fields or corrals located at a distance from the main village,[9] Hopi residences will be discussed with reference to Hopi farming and grazing outside of Moenkopi.

██ The Court will note that a few Hopis resided in Tuba City in 1934: three or four employees of the Indian Service stayed in federal employee housing,[10] and the Hopi Tribe contends that some Hopi children attended boarding school in Tuba City. However, public employment and school attendance are not activities that are sufficient to create a property interest in these areas.

II. *Farming*

The Hopi Tribe claims that Hopis farmed in seven areas in 1934: Moenkopi Wash/Kerley Valley, Reservoir Canyon, Pasture Canyon, the Moenkopi Plateau, the Bakalo, Coal Mine Mesa, and the government-administered farm. Any Navajo farming in these areas will also be addressed.

1. Moenkopi Wash/Kerley Valley

Hopis farmed throughout the Moenkopi Wash/Kerley Valley in 1934. For ease of discussion, the Wash area will be divided into five sub-areas.

---

9. Ex. 651, p. 71 (Adams report).

10. 6 TT at 1031 (Deposition of J. Humetewa); 6 TT at 937–940 (Numkena).

a. *Moenkopi Wash, upstream from the present Highway 264 bridge*

The Hopi Tribe first contends that there were four Hopi fields in 1934 along Moenkopi Wash upstream from the present Highway 264 bridge, for about three miles. (Quad 71, plots 20, 21, 30, and Adams' Site 152). Hopi lay[11] and expert[12] testimony supports this contention. Although the Navajo Nation argues that government documents establish that these fields were not in cultivation in 1936,[13] the testimony of the Hopi witnesses was uncontradicted that the fields were cultivated in 1934.[14] The

Navajo Nation did not present any evidence of Navajos farming in this area.

The Court finds that Quad 71, plots 20, 21, 30, and Adams Site 152 were farmed by Hopis in 1934, and that no Navajos farmed in this area.

b. *Moenkopi Wash, downstream from the present Highway 264 bridge to the Government Farm*

The Hopi Tribe claims that Hopis farmed all the cultivatable land in this area (including Quad 71, plots 11, 12, 12.1, 12.2, 12.3, 12.4, 12.5, 12.6, 12.7, 12.8, 12.11 and 12.13), except for a few acres within Navajo allot-

**11.** William Numkena testified that all of the cultivated plots in this area were farmed in 1934 by Hopis, and that no Navajos farmed in the area. Plot 30 was farmed by his uncle, Edwin Kaye. 6 TT 948, 963–64 (Numkena).

Ira Naseyouma testified at deposition that the farms along the wash east of the bridge were farmed by Hopis: one by a man named Kyarsyawma, who began farming in 1930 or 1931; another owned by Dan Tuuyongwa, whose son-in-law Mark Kyarskwaptiwa was farming in 1934; a farm east of Tuuyongwa's was owned by Alex Humetewa, and worked in either 1934 or 1935 by Howard Lomatywa'yma; another plot was farmed in 1934 by Jackson Tuutsawina and his brother, Joseph Dallas; another was owned by Edwin Kaye (aka "Edwin Kuwanheptiwa") and worked by his son William Kaye; and the last plot was cultivated by Palmer Pongyangoytiwa, Guy Naseyouma's father-in-law. Ex. 736, p. 50–60 (Deposition of I. Naseyouma). *See also,* 11 TT 1798–1800 (Deposition of G. Naseyouma).

The Court will note at the outset that the spelling of Hopi and Navajo names may not be correct. While the Court has made an effort to be consistent in the spelling, government documents, expert reports, and other exhibits sometimes contained varied spellings of names, and these inconsistencies may have been carried over to this opinion.

**12.** Various studies of the United States Soil Conservation Service ("SCS") will be utilized in determining where Hopis and Navajos were farming (and grazing) in 1934. From about 1934 to 1940, the SCS conducted a systematic study of the resources, terrain, people, and livestock of the Navajo and Hopi Reservations, which will be utilized in these Findings. *See* Ex. 2590, Navajo District Annual Report, 1936–1937 at 57–67 (describing studies); Ex. 2653, Navajo District Annual Report 1937–1938 at 55–60 (studies and surveys completed included Agronomy, Engineering, Soils, Range Management, Woodland Management, and Wildlife Management, and socio-economic data).

Hopi expert Dr. Anthony Godfrey testified that SCS documents, including the 1936 LMU3 Agronomy Report, noted four Hopi dry farms in this area (plots 10, 20, 21, and 30). 4 TT 516–18 (Dr. Godfrey); Ex. 657, p. 73 (Godfrey report) (plots 20, 21, and 30 listed as belonging to Hopis Burton Kaye, Ray Tewa, and Edwin Kaye). Another Hopi expert, Dr. Charles Adams, testified that rock art associated with plot 30 (Site 151), had the initials "EK" and "MT", which he believed were for Edwin Kaye and Milo Tewa, with the date 1923. Dr. Adams also testified that Site 152, the easternmost field in the area, existed in 1934 because it was visible in the 1934 Fairchild aerial photographs, and interviews with Hopis established that Henry and Robert Dallas, Phillip Polingyamptewa, and Palmer Accowsie were using the field "circa 1934". 7 TT 1136–38 (Dr. Adams); Ex. 651, p. 85 (Adams report).

Further, Hopi residences were found in the area. *See,* Ex. 651, App. I, Site 80 and 81 (Adams report).

**13.** 1936 Navajo Service Land Management Survey, Unit–3, Agronomy Branch Report, at p. 203516, 203524, and 203527 ("LMU3 Agronomy Report"), Ex. 408, lists most of these fields as idle (excepting ½ acre of plot 30 as an apple orchard.) Further, Adams Site 152 did not appear in the LMU3 Agronomy Report or the 1937 LMU3 Base Map, which the Navajo Nation argues indicates that it did not exist in 1934. However, there is no way to tell from the LMU3 Agronomy Report how long those fields had been idle. 5 TT 643 (Dr. Godfrey).

**14.** The Navajo Nation claims that Ira and Guy Naseyouma's testimony and Dr. Adams' report were somewhat inconsistent regarding the distance of these fields from Moenkopi and the size of the plots. *See,* 11 TT at 1798 (Deposition of G. Naseyouma), Ex. 736 at 57–58 (Deposition of I. Naseyouma), and Ex. 703A, Ex. 661.93. However, this difference was not material regarding whether Hopis were farming in this area in 1934.

ted lands which were farmed by Navajos. The Hopi Tribe introduced testimony that this area was farmed by Hopis, although the testimony was not referenced by plot number.[15] Numerous government documents also confirm Hopi farming in this area.[16]

The Navajo Nation agrees that Hopis farmed Quad 71 plots 11, 12.0, 12.5 (the northern half), 12.8 (the southern portion), and 12.11 (the eastern half). However, the Navajo Nation contends that all other plots are allotted tracts, and excluded from the determination of Hopi interests. The Navajo Nation has admitted that any Navajo farming in this area is on allotted land, which is excluded from litigation. The exact location of the allotments will be determined in the partition proceedings.

The Court therefore finds that this area, excepting Navajo patented allotments which are excluded from litigation, was farmed exclusively by Hopis.

c. *Southside of Moenkopi Wash between Moenkopi Village and the "old Hopi bridge" at the western end of Kerley Valley*

The Hopi Tribe claims that there were numerous Hopi fields in this area (Quad 71, plots 13 and 14; Quad 19, plots 3, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.8), and that no Navajos farmed on the south side of Moenkopi Wash.[17]

The Navajo Nation agrees that Hopis farmed plots 13 and 14 in Quad 71, but argues that most of the area in these plots was located on allotted land. As discussed previously, the exact location of the allotments will be determined in the partition proceedings. That land not located on allotments was farmed exclusively by Hopis.

As to the remaining plots, there was substantial testimony that Hopis farmed extensively in this area.[18] This testimony was not contradicted by the Navajo Nation.

The Navajo Nation does claim that Navajos farmed south of the wash, however,

---

**15.** Roger Honahni testified that his father grew corn in Moenkopi Wash. 3 TT 312 (Deposition of R. Honahni).

Alton Honahni testified that his grandfather, Mike Lomatywa'yma, farmed three fields around Moenkopi, one of which was northeast from Moenkopi. 13 TT 2037–2041 (Deposition of A. Honahni).

William Numkena testified at trial that most of the area down to the government farm was farmed by Hopis, but that Navajos farmed part of the area. 6 TT 948–49, 958–59 (Numkena).

**16.** These documents include the LMU3 Agronomy Report (Ex. 408), the S.C.S. Human Dependency Schedules (Ex. 16, S.C.S.H.D.S. #248, 4/9/37 (Sam Numkena farmed plot 12.3); Ex. 18, Schedule #256, 4/4/37 (Ernest K. Moore farmed plots 12.8B and 12.11A); Ex. 19, Schedule #259, 4/15/37 (Frank Nuhtayma farmed plot 12.6); Ex. 20, Schedule #255, 4/14/37 (Mark Quashura farmed plot 12.5B); Ex. 21, Schedule #250, 4/19/37 (Roger Honahni farmed plot 12.13); Ex. 22, Schedule #258, 4/19/37 (John Talashoyiwma farmed plot 12.6); and the "Lomavitu list" of Hopi field plots at Moenkopi in April, 1937 (Ex. 493A).

**17.** William Numkena testified that no Navajos farmed on the south side of Moenkopi Wash in the 1930's. 6 TT 949–951, 30 TT 4189 (Numkena). Guy Naseyouma testified that in 1934, some Navajos were farming on the kwiningyak (northwest) side of the wash. Ex. 740, p. 346–347 (Deposition of G. Naseyouma).

**18.** William Numkena testified at trial that his father farmed plot 3.1. 6 TT 949–951, 30 TT 4189 (Numkena).

Guy Naseyouma testified at deposition that he farmed an approximately 10 acre-field with his father-in-law on the taatoq (southeast) side of the wash. 11 TT 1800–02 (Deposition of G. Naseyouma). Ex. 740, p. 195–197 (Deposition of G. Naseyouma).

Ira Naseyouma testified at deposition that a number of Hopis farmed south of the wash, including Talasvuyawma (who shared his farm with Lomatywa'yma), Gilbert Kawwtsi, Sam Numkena, Kopolvu, Frank Siyamtiwa (who shared his plot with Ted Honyamtiwa), his uncle Pavonyawma (who shared the plot with Jackson Hoosava), Elmer Tuwaventiwa, Sam Sami and his son Melvin Tiwa, Nasitoyniwa, his son-in-law Gilbert Honsuru, his son Ray Nasitoyniwa, Palmer Pongyangoytiwa (who worked his field with the help of Ira and Guy Naseyouma), Charlie Talawipi and his son Irvin Charlie and son-in-law Walter Albert, Jackson Tuutsawina and his son, Ralph Jackson, Joseph Dallas, Ray Tuutsawina, Guy Naseyouma, who worked the field with Ira, and Tuveyestiwa (who worked the plot with Charlie Talawipi).

*See also*, 4 TT 505–07 (Dr. Godfrey); Ex. 657, pp. 64–72 (Godfrey report) (1936 LMU3 Agronomy Report listed Hopis as farming on plots 3.0, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, and most of 3.8).

including Joe Willie (Camp 297)[19], Elvin Nez (Camp 276), and Louise Skacy (Camp 168).[20] The Court finds that none of these Camps farmed south of the wash in 1934,[21] and that this area south of the wash was farmed exclusively by Hopis.

d. *North of Moenkopi Wash and south of the old Tuba City–Cameron Road, between the Government Farm on the east and the old Hopi bridge on the west*

Both parties agree that Hopis and Navajos farmed in Quad 19, though disagree where each farmed. The area in dispute is labelled "A" through "M" on Hopi Attachment 1 to its response to the Navajo Proposed Findings.

First, the parties do agree on the use of a few areas. The Navajo Nation concedes that Hopis farmed in areas "E" and "H".[22] Further, the Hopi Tribe concedes that Navajos were farming areas "A", "B", "F", "G", "J", and "M" (plots 1.1, 1.8A, and 1.9 on the SCS maps).

Much of area "C" is in dispute: both Tribes contend they used plots 1.8B. 1.8C, and 1.8D. However, no witness was able to accurately estimate the location of the various farms or estimate acreage used by

**19.** A Navajo "camp" is not a residential location, but a group of individuals who reside in close proximity to one another. Because Navajos are "matrilocal", meaning that a married man goes to live with his wife's family, Navajo camps frequently consist of an older couple, their married daughters and sons-in-law, and the unmarried children of each. 15 TT 2285–90 (Dr. Russell).

**20.** The area of contention is labelled area "I" on Attachment 1 to the Hopi response to the Navajo Proposed Findings (and as plot 3.8 on Ex. 726), and as areas "B" and "C" on Attachment 1 to the Navajo response to the Hopi Tribe's Proposed Findings (plot 42, 62, 63, and 85 on Ex. 3571).

The parties dispute which is the correct map to use to depict farming in Kerley Valley. The Hopi Tribe has attached a 1937 United States Geological Survey (USGS) map drawn by Page and Lomavitu from 1934 aerial photography to identify farming locations (Ex. 726). The Navajo Nation argues that the 1947 Base Map, Exs. 2856 and 3571, is more accurate and depicts man-made features not on the USGS map to assist in identifying the farming locations, and that Ex. 726 is not drawn to scale. The Hopi Tribe argues that Ex. 2856/3571 is not representative of Kerley Valley in 1934 since the map was made in 1947, and omits important areas near Moenkopi Village. As the Court is not identifying specific locations of farms or allotments at this stage, the map used is not essential. Since the maps use different plot numbering systems, the Court will attempt to designate the plot numbers on each map, or will refer to general areas of disagreement.

**21.** Dr. Scott Russell, the Navajo expert, concluded that plots 42 and 85 were farmed by Camp 297, the family of Joe Willie. Although the residence area of Camp 297 (Site 3–20) was located north of the wash (see Ex. 3571), Dr. Russell was taken to both fields south of the wash by Joe Willie. 19 TT 2743–46 (Dr. Russell). Plot 85 (area "L" on Hopi Attachment 1) was treated as "empty" on Ex. 493A, the Lomavi-

tu list of field plots, and none of the S.C.S. maps indicate this area was cultivated. *See* Ex. 726, 3258, 3246.

Dr. Russell was taken to Plot 63 by descendants of Elvin Nez, who was a member of Camp 276 in 1934. 19 TT 2743–46 (Dr. Russell). Richard Butler (of Camp 297), who was 26 years old in 1934, spent his summers in Kerley Valley and testified that Elvin Nez farmed south of the wash. 25 TT 3622 (Butler). However, the 1937 Human Dependency Schedule # 87 lists Nez as farming north of the wash (quad 19, field no. 1). Ex. 754.

Dr. Russell further testified that Louise Skacy (Camp 168) had a house south of the wash, associated with several corrals and a sweat lodge. 18 TT 2630 (Dr. Russell) (Site 3–19). Several descendants of Skacy and Joe Willie informed Dr. Russell that Skacy farmed this plot in 1934. 19 TT 2746–47 (Dr. Russell). Richard Butler also testified that Skacy farmed south of the wash. 25 TT 3622 (Butler). The Hopi Tribe argues that there is insufficient evidence that the Skacy family lived south of the wash. William Numkena testified that John Skacy resided only on the north side of the wash in 1934, which matches the location of Site 3–19A. Moreover, the house was not visible in the 1934 aerial photographs.

Further, the 1936 LMU3 Agronomy Report, Ex. 3169, lists only Hopi farmers south of the wash.

**22.** Dr. Godfrey testified that Hopis were farming approximately 30 acres within plot 1.7 (area "E"), 5 TT 728–29 (Dr. Godfrey); William Numkena testified that both Hopis and Navajos farmed in plot 1.7, including Nehoitewa, Nasenumptewa, John Skacy, and Mark Twain. 6 TT 954 (Numkena). The Navajo Nation did not contradict the testimony of Alton Honahni that area "H" was used by Alex Humetewa in 1934.

either Tribe,[23] and the Court finds that this area was jointly used.

Further, the parties dispute whether areas "D" and "K" were used by Navajos; although the Hopi Tribe does not claim that Hopis farmed in these areas, a Hopi witness testified that they were uncultivated and covered by greasewood in 1934,[24] and there is no documentation of Navajo use. The Court finds that areas "D" and "K" were uncultivated in 1934.

The Court finds that the area north of Moenkopi Wash and south of the old Tuba City–Cameron Road, between the Government Farm on the east and the old Hopi bridge on the west, was jointly used by Navajos and Hopis in 1934.

### e. *Kerley Valley, north of the old Tuba City–Cameron Road*

The Hopi Tribe claims that Hopis farmed just west of Kerley's Trading Post in Quad 19, plot 1.6 and 1.8.[25] The Navajo Nation contends that plot 1.6 was not under cultivation in 1934, and that a Navajo farmed plot 1.8. Also, the Navajo Nation contends that Navajos farmed plots 1.10, 1.5, and 1.4 (which the Hopis contest), but the Hopi Tribe concedes that Navajos farmed plots 1.6e and 1.9.

The Hopi Tribe introduced substantial testimony that Hopis farmed plot 1.6 in 1934.[26] Further, the evidence indicates that plots 1.8, 1.4, 1.5, and 1.10 were farmed by Navajos.[27]

**23.** William Numkena testified that Gaseoma and a man named "Big Burton" farmed in plot 1.8. 6 TT 953 (Numkena).

Ira Naseyouma testified at deposition that a Navajo named Skacy, George Nuvayestiwa, Nasinomtiwa, Lomatywa'yma, Burton Qoyangyamtiwa, Talasvuyawma, Roger Qoyaheptiwa, Jim Siwiheptiwa, Sam Sami (Tuwangoytiwa), Siletstiwa, and Kyarsyawma had farms west of the government farm. 9 TT 1457–71 (Deposition of I. Naseyouma).

Guy Naseyouma testified at deposition that there were many farms on the kwiningyak (northwest) side of the wash. He confirmed that a few Navajos worked fields immediately west of the government farm, and that west of that, Hopis including Tuwanomtiwa, Nasinomtiwa, Qoyangyamtiwa, Qoyaheptiwa, Lomatywa'yma, Sileptiwa, Siletstiwa, Tiwa, Humihongiwa, Kyarsyawma, worked fields almost to the old bridge. 11 TT 1804–0541 (Deposition of G. Naseyouma); Ex. 740, 203–206, 211–212, 346–350 (Deposition of G. Naseyouma).

Alton Honahni testified that his grandfather, Lomatywa'yma, farmed west of the Kerley Trading Post (within plot 1.7), and that Jimmy Siwiheptiwa, George Nuvaystiwa, John Nasinomtiwa, Talasvuyawma, Roger Qoyangyamtiwa, and Burton Qoyangyamtiwa owned farms to the east of his grandfather. Alex Siwiheptiwa, Frank Siyamtiwa, Tumosi, Honyamtiwa, Kopolvu, Gaseoma, Pavonyawma, and one Navajo had farms west of his grandfather. 13 TT 2042–51 (Deposition of A. Honahni).

James Humetewa testified at deposition that about 10 Hopis were farming in the wash southwest of the trading post in 1934. Ex. 732, p. 175 (Deposition of J. Humetewa).

*See also,* 4 TT 507–09 (Dr. Godfrey); Ex. 657, p. 55–70 (Godfrey report).

The Navajo Nation contends that a large portion of this area was farmed by Navajos. 19 TT 2750–58 (Dr. Russell) (Richard Butler (Camp 297), Joe Begay (Camp 185), Navajo Posey (Camp 67), and Hosteen Yazzie (aka John Sullivan) and Sam Tohannie Spencer (Camp 58) farmed this area).

**24.** 13 TT 2048–49 (Deposition of A. Honahni).

**25.** This plot 1.8 is farther north than the one discussed in the previous section. It is unknown why two plots were numbered the same.

**26.** William Numkena testified that his uncle Lewis Numkena, Harold Sileptiwa, and Harold Tewatewa farmed plot 1.6 just west of Kerley's Trading Post. He did not recall if Navajos also farmed this area. 6 TT 955–56, 4192 (Numkena). Although on cross William Numkena stated that he was not certain when the plot was under cultivation, 6 TT 987 (Numkena), when he was recalled to the stand, he testified that he remembered working on plot 1.6 in 1934, throughout the mid–30's. 30 TT 4192–93 (Numkena). He also testified that Lewis Numkena and a Navajo Boyd Tisi farmed a place called "Little Phoenix" in back of Kerley's Trading Post, a canyon above the rest of plot 1.6. 6 TT 949, 957 (Numkena).

Although the 1936 SCS map depicting the locations of fields north of the road depicts this field as uncultivated, (*see* Ex. 3232, LMU3 map p. 5681), Ex. 408 at p. 203495, indicates plots 1.6 and 1.8 were under cultivation, the Lomavitu lists a Hopi owner for plot 1.6 (*see* Ex. 493A), and the 1934 aerial photographs show the field as a cultivated area. Ex. 712, Attachment 4.

**27.** William Numkena testified that this plot was occupied, though not farmed, by a Navajo. 6 TT 952 (Numkena). The Agronomy Reports reference to a Hopi-owned plot 1.8 is more likely to the plot 1.8 located south of the road, discussed in a previous section. Ex. 408, p. 203495; Ex. 3169, TC16944. The Hopi Tribe did not introduce any other evidence that plot 1.8 was farmed by Hopis.

Due to the established presence of both Navajo and Hopi farms in this area, the Court finds that the area was used jointly.

2. Reservoir Canyon, south of the reservoirs and northeast of Moenkopi Village

The Hopi Tribe claims that Hopis farmed Quad 71, plots 19, 28, and 29, and that no Navajos farmed in this area.[28] The Navajo Nation does not contest this assertion. The Court finds that Reservoir Canyon is a Hopi exclusive use area.

3. Pasture Canyon, north of the reservoirs and south of the Government Pasture

The Hopi Tribe contends that Hopis farmed quad 71, plots 14, 15, and 16.[29] The Navajo Nation agrees that Hopis farmed 18 acres in Pasture Canyon.[30]

Although the Navajo Nation does not contend that Navajos farmed in this area, the Navajo Nation contends that Navajos used this area for other grazing. Grazing will be addressed later in this order. The Court finds that only Hopis used Pasture Canyon for farming.

4. Moenkopi Plateau

The Hopi Tribe contends that Hopis farmed at Quad 71, plots 1, 10, and 22 on the central Moenkopi Plateau above "Owl's Cap". The Navajo Nation disputes that these plots were farmed in 1934, since the LMU3 Agronomy Report indicated that these plots were idle by 1936.[31] However, the Hopi Tribe introduced substantial testimony that these plots were being farmed in 1934.[32]

The Hopi Tribe also argues that no Navajos farmed on the Moenkopi Plateau. However, the Navajo Nation has introduced sufficient evidence that Navajos farmed Quad 70, plots 1 and 2.[33] This area is located south of the Hopi claimed exclusive use area. The Navajo Nation also claims this area was used extensively for other uses, such as grazing, which will be addressed in a later section of this order.

The Court finds that the central Moenkopi Plateau above Owl's Cap was farmed exclusively by Hopis, and that the southern Moenkopi Plateau, south of the Hopi claimed exclusive use area, was farmed exclusively by Navajos.

5. The Bakalo, or Hollow Place

The Hopi Tribe argues that Hopis farmed Quad 71, plots 2, 6, 7, 8, 9, and 24. Although the Navajo Nation concedes that plot 2 (35 acres), plot 8 (1 acre), and plot 9

Dr. Russell testified that these fields were farmed by Navajos, based on information from his informants. 19 TT 2757, 2761 (Dr. Russell), and Dr. Godfrey admitted that these sites were probably Navajo fields. 4 TT 504 (Dr. Godfrey).

**28.** LMU3 Agronomy Report, Ex. 3169, TC16973 and TC16976; Ex. 408, p. 203524, 203527 (Hopis farmed 10 acres in plot 19, 10 acres in plot 28, and 2 acres in plot 29).

**29.** Dr. Adams opined that dated rock art at Sites 100, 102, 122 and 159 established that Hopis were farming in Pasture Canyon in 1934. Ex. 651, pp. 77–78, 86–87.

**30.** LMU3 Agronomy Report, Ex. 3169 at TC16971; Ex. 408 at 203522 (plot 14 (1 acre), plot 15 (7 acres), plot 16 (10 acres).

**31.** Ex. 3169 at TC16962, 965, 974; Ex. 408, at 203513.

**32.** Roger Honahni testified at deposition that Edwin Kaye and Jackson "T" [Tewa] farmed an area identified by the Hopi Tribe as plot 1 in 1934, 3 TT 430–431, Ex. 722g (Deposition of R.

Honahni), and that Burton Kaye and Gail Burton farmed another field identified as plot 22. 3 TT 433; Ex. 722g (Deposition of R. Honahni). Further, William Numkena testified that Jackson Tewa farmed plot 1 in the mid-1930's. 6 TT 968 (Numkena). Alton Honahni testified that his grandfather Fred Honahni had a field west of Posiwlelena, southeast of the Village of Moenkopi. 13 TT 2053–2055 (Deposition of A. Honahni). See also, 4 TT 516–21 (Dr. Godfrey); Ex. 657, p. 130 (Godfrey report); 7 TT 1134–35 (Dr. Adams) (Site 131); Ex. 651, p. 88 (Adams report).

**33.** Dr. Russell testified that plot 1, just north of Goldtooth Ranch, belonged to Goldtooth, and field 2, just south of Goldtooth, was farmed by Adolph Heavy, Frank Goldtooth's father-in-law. 19 TT 2790 (Dr. Russell). This was confirmed by Lena Goldtooth Canyon. 24 TT 3435–37, 3446–49 (Canyon). This testimony was not contradicted by the Hopi Tribe. Further, the LMU3 Agronomy Report listed Goldtooth as the owner of field 1 (though listed the field as idle). Ex. 3169, TC16961.

(1 acre) were Hopi farms, it argues that plots 6 and 7 and some of plot 2 were shown as idle in the 1936 LMU3 Agronomy Report, indicating that these fields were not in cultivation in 1934.[34] However, the Hopi Tribe introduced sufficient testimony to conclude that all of these plots were under cultivation.[35] This testimony was corroborated by expert findings.[36] The existence of these fields was revealed in the 1934 aerial photographs.

The Navajo Nation also argues that plot 24 was farmed by a Navajo named Tohannie. The LMU3 Agronomy Report lists him as the owner of this plot,[37] and Dr. Godfrey testified that he did not know who farmed this plot in 1934.[38] However, the Hopi Tribe argues that plot 24 was farmed by Tom Holmes and his three sons, Willard and Ernest Holmes and Edward Honeyestewa (Adams Site 136), and that other testimony indicated that the listing of "Tohannie" as the owner of this plot must have been a mistake.[39]

The Court finds that the Bakalo (Hollow Place) was exclusively farmed by the Hopis.

### 6. Coal Mine Mesa

The Hopi Tribe contends that Hopis farmed Quad 71, plots 3, 4, 5, and 31, and that no Navajos farmed in this area.[40]

Although the Navajo Nation agrees that Hopis farmed 9-acres in plot 31 in the southern portion of Coal Mine Mesa,[41] the Navajo Nation claims that the other plots

---

**34.** Ex. 3169 at TC16962–64.

**35.** Roger Honahni testified at deposition that his father had a field in 1934 in the Bakalo, and that other Hopis had fields in the area, including Clay Johnson, Gaseoma, Edward Holmes, Milo Tewa, Forrest Kaye, Sonny Dallas, Jackson Tewa, Edwin Kaye, Burton Kaye, Henry Dallas, Robert Dallas, Stephen Dallas, Nasitoyniwa, and Bryan Gilbert. 3 TT 295–99; 424–30 (Deposition of R. Honahni).

William Numkena testified at trial that Clay Johnson and Gaseoma farmed plot 2 in the mid–1930's, Rowland, Roger, and Stanley Honahni, George Nuvayestiwa, and Edwin and Forrest Kaye farmed plot 6, Milo Tewa farmed plot 7, Roy Tewa farmed plot 8, and an unknown Hopi farmed plot 9. 6 TT 966–67 (Numkena).

Ira Naseyouma testified at deposition that Clay Johnson had a fenced-in farm at "Paqlo" (the Bakalo) south of Moenkopi, about 10 miles southwest of the new highway, in 1934. "Old Kyarsyawma", Milo Tewa, Sikyaleetsiwma and his son Roger Honahni, and Honahni's son Steven Dallas, and Siletstiwa also had fields in the area. Ex. 736, pp. 127–53 (Deposition of I. Naseyouma).

Alton Honahni testified at deposition that his grandfather Fred Honahni had a field at the Bakalo, and that quite a few Hopis farmed in the same area. 13 TT 2054–55 (Deposition of A. Honahni).

**36.** Dr. Godfrey's report states that the LMU3 Agronomy Report documents Hopi dry farming in the Coal Mine Mesa/Bakalo area, as does Gordon Page's 1939 Human Dependency Study. Ex. 657, pp. 126–35 (Godfrey report). *See also* Ex. 651, p. 87 (Adams Report) (the LMU3 Agronomy Report identified Clay Johnson and Gaseoma as farming plot 2 (Adams Site 21), Roger and Roland Honahni, Forrest Kaye, George Nuvayestiwa, and Milo Tewa were identified as users of plot 6 (Adams Site 135). Site

88 was used by Milo Tewa, and Site 136 was used by the Holmes family.

**37.** Ex. 3169 at TC16974.

**38.** 4 TT 521 (Dr. Godfrey).

**39.** James and Fannie Tsinnie, Mr. Tohannie's son-in-law and daughter who were members of his camp, never told Dr. Russell that Tohannie had farmed in the Bakalo. 22 TT 3138–44 (Dr. Russell). Also, Alton Honahni and Lena Canyon testified that no Navajos farmed in the Bakalo. 13 TT 2055–56 (Deposition of A. Honahni): 24 TT 3470 (Canyon). *See also*, Ex. 651, p. 87 (Adams Report) (no informant had knowledge of Tohannie using plot 24).

**40.** William Numkena testified that Earl Numkena and his uncle Nasitoyniwa farmed in this area in the mid–1930's; Brian Gilbert and Nasitoyniwa were farming plots 2 or 3, George Navayestewa and Forrest Kaye farmed plot 5, and Jackson Tewa farmed in the area around plot 31, though he did not know specifically who farmed plot 31. Numkena did not know who farmed plot 4. He did not see any Navajo farmers on Coal Mine Mesa in the mid–1930's. 6 TT 949–69 (Numkena).

Roger Honahni testified at deposition that Jackson, Harold and Roy "T" farmed south of Porskwi in 1934. 3 TT at 431 (Deposition of R. Honahni). The LMU3 Agronomy Report identifies field 31 as .cultivated by Jackson Tewa and Harold Tsavatewa.

Ira Naseyouma testified at deposition that Harold Tuutsawina owned a farm about two or three miles "from charcoal" in 1934. Ex. 736, p. 149 (Deposition of I. Naseyouma). This testimony was not specific enough to locate a field.

**41.** *See* Ex. 3169 at TC1697.7; Adams Site 95.

were no longer under cultivation in 1934. Dr. Adams testified that the Hopis he interviewed indicated that the Nanmuru area became too dry in the late 1920's and that the fields were not in use in 1934.[42] Also, Gordon Page's 1939 Human Dependency Study found tract nos. 3, 4, and 5 to be idle. The Court finds that only field 31 was under cultivation in 1934.

The Navajo Nation admits that no Navajos farmed in this area, though it contends Navajos grazed livestock in this area. Other uses will be addressed in a later section.

The Court finds that only Hopis farmed on Coal Mine Mesa in 1934, as indicated above.

### 7. Government-administered Farm Land

In 1934, the Indian Service administered two tracts of land by Moenkopi/Tuba City for the benefit of the Tuba City Boarding School, which was attended by Navajo and Hopi children. The Hopi Tribe contends that Hopis worked on the "Government Farm" depicted on Ex. 707, Attachment 1 and Ex. 3571, and the "Government Pasture" in Pasture Canyon, depicted on Ex. 707, Attachment 2. The Hopi Tribe also contends that after 1934 these lands were relinquished to individual Navajo and Hopi farmers.

Public employment on government lands is not sufficient to establish that the Hopi Tribe had a property interest in this land in 1934. In fact, Hopi witnesses testified that in 1934, no Hopis used the government land.[43]

### III. *Grazing*

The Hopi Tribe claims an interest in 1.25 million acres of land it argues was used by Hopi livestock in 1934. Hopi grazing practices were traditionally influenced by cultural and religious practices: the distances Hopis would go from the village to tend their livestock or for other purposes was in general limited by the preference of the Hopis to return to their village before dark every evening. However, the establishment of herding cooperatives, where one member would remain with the livestock overnight rather than returning to the village, allowed herding sites farther from the village.

The Hopi Tribe contends that Hopis tended to herd sheep and goats within a 15–mile radius from the villages. The Hopis claim that outlying corrals, water sources, camps and ranch houses support the claims of more distant sheep ranges utilized by sheep cooperatives, and that sheep were typically herded from 2–6 miles from these corrals.[44]

The Navajo Nation argues the Hopi Tribe overestimates the distance that sheep would graze from the village, and instead asserts that sheep grazed in a 2–4 mile radius around each corral, all of which were within a couple of miles from the village.[45] The Court will examine the evidence regarding the existence of Hopi sheep corrals and/or field houses to determine how far the Hopis grazed sheep from the village.

The Hopi generally permitted cattle to graze freely over the unfenced range in search of forage and water. Cattle were permitted to wander unsupervised, although they were occasionally driven back toward the village and were rounded up once a year.[46] The existence of cattle coop-

---

42. 4 TT at 1134, 1248–49, 1256 (Dr. Adams); Ex. 651, p. 88 (Adams report).

43. 3 TT 467 (Deposition of R. Honahni); Ex. 740 at 362 (Deposition of G. Naseyouma).

44. 10 TT 1503–04, 1528, 1564 (Dr. McCawley).

45. Ex. 224 p. 3 (Report of Chester E. Faris, District Superintendent to Commissioner of Indian Affairs, 5/12/28); 7 TT 1101 (Dr. Adams) (Hopi sheepherders went back to the village at night); 2 TT 276 (Nasevaema) (brought Naseyawma's sheep back to the village each night).

46. Ex. 224, p. 3 (Report of Chester E. Faris); Ex. 464 pp. 5–7 (Page, *Hopi Range Use,* 1938); 4 TT 525–26 (Dr. Godfrey) (cattle "were not herded, and especially not in the winter time [when they were] left to fend for themselves literally out on the range"; "[n]ormally there was one roundup a year, usually in the early summer"); 10 TT 1504 (Dr. McCawley) ("Hopis have very loose management of … their cattle … During the winter, the cattle were allowed to drift and to seek out forage and water as they chose").

eratives allowed some Hopis more active management of cattle. Horses were either kept close to the villages, or were allowed to graze with the cattle.

In 1937, the SCS determined that Hopis residing at Moenkopi owned 893 sheep and goats, 403 cattle and 106 horses, for a total of about 3,000 sheep units.[47] Earlier studies showed a lower sheep unit count.[48] Although the number of animals will not determine the amount of land used, it is indicative of the intensity of grazing by Hopis.[49] The SCS also found that Hopi livestock shared a range of about 70,000 acres with Navajo livestock.[50]

There are inadequacies in the SCS information in determining grazing patterns in 1934, partly due to the fact that most of the SCS studies were conducted after 1934: the SCS studied range conditions in 1936–1937, and did not study livestock and range use until 1937–1940.[51] Further, the original 1936–1937 LMU3 data on Hopi livestock holdings and the LMU3 Human Dependency Survey Schedules have been lost and were not available for trial.[52] Although the Hopi Tribe contends that range use patterns, water sources, and livestock numbers had changed significantly since 1934,[53] the Hopi Tribe admits there is no direct evidence that Hopi livestock was reduced in the government's livestock reduction program after 1934. Unless reliable evidence contradicts the information provided in the SCS studies, such as forceful testimony

regarding use in 1934, the Court will accept the findings of the SCS.

The Navajo Nation argues that the maps introduced by the Hopi Tribe to demonstrate the Hopi grazing areas do not reflect the intensity of livestock use in the area, and thus are not a fair representation of Hopi use. Further, Dr. Godfrey added an extra ten miles beyond points mentioned in historical accounts to estimate grazing areas, and admitted the maps were only "general" and did not represent *actual* grazing areas.[54] Dr. Ainsworth also admitted his map depicted only a general area.[55] Further, the Navajo Nation contends that Dr. McCawley's estimates of grazing areas are not accurate because he did not take into account competing Navajo livestock, did not evaluate water and forage around Moenkopi, and did not estimate frequency of use.[56]

The Court will not adopt the maps of the Hopi experts as actual representations of Hopi grazing areas in 1934, but as visual representations of the expert opinions. The Court will examine the testimonial, archeological, and documentary evidence regarding Hopi grazing east of the 1882 Reservation, south of the 1882 Reservation, and west of the 1882 Reservation in several areas, including Pasture Canyon, Ward Terrace, the western and northern Moenkopi Plateau, the southern and central Moenkopi Plateau, the Bakalo (or Hollow Place), the Little Bakalo, Coal Mine Mesa, Moenko-

**47.** Ex. 451, Page, *Stock Ownership–Moencopi Village,* 4/15/37 at 3.

**48.** Ex. 2239 at 2, Letter from Walker to Hagerman, 11/20/30 (2,800 sheep units); Ex. 3193, 1936 Dipping Records (884 Hopi sheep and goats).

**49.** The Hopi Tribe contests these statistics for Hopi livestock ownership, arguing that Moenkopi Hopis owned between 2,400 and 5,000 sheep units in 1934. However, this encompasses the SCS estimate of 3,000 sheep units.

The Hopi Tribe provides alternative statistics: Dr. Godfrey reported that Moenkopi Hopis owned 495 cattle in the late 1930's, based on a review of all SCS documents. Ex. 656, p. 181–182 (Godfrey report). In 1925, a roundup of cattle in the Western Navajo jurisdiction indicated that Hopis owned 850 cattle. 4 TT 544

(Dr. Godfrey); Ex. 656, p. 167–168 (Godfrey report). In 1930, William Zeh reported that Moenkopi Hopis owned 3000 sheep and 800 cattle. Ex. 268, p. 25.

**50.** Ex. 451, Page, *Moencopi Village Stock Operators and Range,* 4/15/37.

**51.** 10 TT 1499 (Dr. McCawley).

**52.** 16 TT 2356 (Dr. Russell).

**53.** Ex. 656, p. 187–93 (Godfrey report).

**54.** 4 TT 536–537, 5 TT 787 (Dr. Godfrey).

**55.** 12 TT 1892, 2008 (Dr. Ainsworth).

**56.** 10 TT 1510–11, 1521–23, 1558–59, 1570 (Dr. McCawley).

pi Wash/Kerley Valley, and other areas north of Moenkopi Wash.

### A. *East of the 1882 Reservation*

The Hopi Tribe contends that Hopis from First Mesa used about 130,000 acres in this area, citing various historical documents in support of the assertion.[57] However, none of these documents establish that Hopis grazed east of the 1882 Reservation. In fact, SCS investigations in the mid–1930's found no significant use by Hopi livestock for LMUs 10 and 17, which extend over·the area east of the 1882 Reservation.[58] Moreover, two Navajos who lived along the eastern boundary testified that they did not see Hopis herding east of the 1882 Reservation in the 1930's.[59]

Because the Hopi Tribe failed to introduce any testimony corroborating Hopi grazing east of the 1882 Reservation boundaries, and government documents do not establish that Hopis grazed east of the border, the Court finds that the Hopi Tribe was not "located" east of the 1882 Reservation in 1934.

### B. *South of the 1882 Reservation*

The Hopi Tribe contends that Hopis from First, Second, and Third Mesas used a range of 425,000 acres south of the 1882 Reservation, when Hopi cattle grazed south along the drainages to lower elevations in the winter. Further, the Hopi Tribe claims that First Mesa Hopis grazed horses in the Hopi Buttes area around Cedar Springs year-round.

The Hopi Tribe again offers various historical documents in support of this claim. These documents do not prove that Hopi cattle grazed south of the 1882 Reserva-

---

**57.** The first, a letter from Oliver LaFarge to Dr. Eahref Shevky of the U.S. Conservation Service, dated September 24, 1936, states, "Kyakotsmovi cattle is run as far down as the Leupp Jurisdiction boundary"; "This line embraces territory now grazed by the Tewas. At the ... [illegible] ... graze beyond it, clear to the well S of the Black Mountain Store". Ex. 416. The Navajo Nation contends that LaFarge's reference to "Black Mountain Store" might have been regarding the trading post at Pinon, located on Black Mesa (sometimes called "Black Mountain"), within the 1882 Reservation, and that the Leupp Jurisdiction boundary is the 1882 Reservation southern boundary. 20 TT 2905–08 (Dr. Russell). This was not contradicted by the Hopi Tribe. In any event, LaFarge does not disclose the source of his information, nor indicate how many cattle were seen.

In 1938, Gordon Page reported that Albert Naha and George Lomayesva "ranged stock from Red Lake on the south to Low Mountain on the north, and from the Hopi Buttes on the west to Cow Springs in the northeast", and that Ross Macaya and Roger Tuvavantewa run "the largest outfit made up of ·cattle of the Third Mesa group. Their range extends down the north bank of Oraibi Wash as far as Blue Lakes; however, their stock drifts on south as far as the Sand Springs Trading Post." Ex. 464, p. 3 ("Report on Hopi Range Use"). The Navajo Nation contends that Page's report does not establish any Hopi use east of the 1882 Reservation: Cow Springs is just outside the 1882 Reservation border, and there is no indication of frequency of use. Dr. Godfrey admitted that the other locations mentioned in this letter were all within the 1882 Reservation boundaries. 5 TT 791, 794 (Dr. Godfrey).

A letter ·from G.A. Trotter, Acting Superintendent, to Commissioner of Indian Affairs, dated March 9, 1938, reported that Hopi stockmen were using Districts 5, 3, 4, and 7. Ex. 473. However, there was no discussion of extent of use or numbers of stock, and part of LMUs 3, 4, 5 and 7 are within the 1882 Reservation, and there is no indication of more precise grazing areas.

A memorandum from Gordon B. Page to J. Nixon Madley, dated October 7, 1938 discussed Hopi grazing outside of District 6. Ex. 480. Again, however, there is no indication that there was grazing outside the 1882 Reservation. Dr. Godfrey admitted that all locations mentioned are within the 1882 Reservation. 7 TT 794–95 (Dr. Godfrey).

**58.** Ex. 3461, LMU10 Human Dependency Survey. *See also,* 20 TT 2908 (Dr. Russell) (report does not make reference to Hopis living in LMU 10); Ex. 3476, LMU10 ̇1937 Livestock Census (only Navajos are listed as permittees for LMU10); 20 TT 2912 (Russell) (same); Ex. 3488, LMU17 Human Dependency Survey (total Navajo population of ̇3,841; does not mention Hopi population); Ex. 3506, LMI17 1937 Livestock Census (only Navajo permittees listed); 20 TT 2929 (Russell) (same); Ex. 3482, LMU17 1936 Land Planning Report (refers to total Navajo population of LMU17; no mention of Hopis).

**59.** Sam Billy testified that there was no Hopi grazing around Pete Springs ("Beeshbito Springs"), 27 TT 3850–51 (Billy), and Francis D. Tsosie testified that no Hopis brought livestock to the well at Cottonwood School, just east of the 1882 border between LMU4 and LMU10, and he did not see Hopi livestock in that area. 28 TT 3961–62 (Tsosie).

tion.[60]

The Hopi Tribe also introduced the deposition of Reuben Lomayesva, who described his family's herding in the area around the southern border.[61] However, his family lived at Shonto Springs seven miles north of the border, and he personal-ly never went south of the 1882 Reservation boundary, so his testimony was not based on first-hand knowledge.[62] Further, the Hopi expert testimony, largely based on the documents cited earlier, did not establish by a preponderance of the evidence that grazing occurred south of the 1882 Reservation.[63] Moreover, Navajo testimo-

60. Exs. 416, 464, 473, and 480 were addressed in the previous section. Ex. 464's reference to a range extending "down the north bank of Oraibi Wash as far as Blue Lakes ... and south as far as the Sand Springs Trading Post" refer to locations within the 1882 Reservation boundaries, as conceded by Dr. Godfrey. As to a reference that "in some cases" Hopi cattle "drift[ed] south" "as far as Tolani Lakes", Dr. Godfrey admitted that this did not say that Hopi cattle went farther south than Tolani Lakes, which straddles the southern border. 5 TT 787 (Dr. Godfrey). Further, Gordon Page testified at deposition that the cattle tended to stop at Tolani Lake because the availability of water; he did not see any Hopi cattle grazing south of the 1882 border. Ex. 3579 at 46–47 (Deposition of Page).

The Hopi Tribe also introduced Ex. 493, the Hopi Land Management Unit Hopi–Navajo Boundary Report, Report of the Human Dependence Survey, by Gordon B. Page, dated December, 1939. However, Dr. Godfrey conceded that the locations listed were within the 1882 Reservation boundaries. 5 TT 800, 810–811 (Dr. Godfrey) (Tovar Mesa, Jeddito Valley, Naha Wells, Little Star, Wide Top Butte, and White Cone).

Ex. 501, "Hopi Agricultural Notes", by Gordon B. Page dated May 4, 1940, refers to Hopis ranging down Oraibi Wash as far as Blue Lakes and south to Sand Springs Trading Post; these locations were within the 1882 Reservation boundaries. 5 TT 791, 794 (Dr. Godfrey) (conceding).

The Hopi limitation within 1882 Reservation boundaries was confirmed by Page's 1938 report on Hopi range use: "Stockmen from First Mesa run cattle down the Jeddito Wash in L.M.U. No. 7 parallel *to the present boundary*." Ex. 464 at 4 (emphasis added). Further, the LMU7 Planning Report, Ex. 3359, p. 63, stated, "[p]ractically all of the Hopis that are found in Unit No. 7 are located along Jeddito Wash" in sub-Unit No. 2, along the southern boundary of the 1882 Reservation.

Ex. 3319, the LMU5 Dipping Record 1937, dated 2/15/38, shows that several Hopis dipped livestock in LMU5, but does not state where in Unit 5 Hopis grazed or were dipped. Ex. 3372, the LMU7 Livestock Count from 1937 Dipping Records does not identify the ownership of livestock.

61. Reuben Lomayesva testified his grandfather George Lomayesva and the family herded around Echo Canyon, northeast of Keams Canyon, at Shonto Springs (Masiipa) within District 6, and from Masiipa to the Little Colorado River. The family would allow their cattle to roam, and they would scatter in the winter along Hooypai, down toward Matovi (northwest from Tovar Mesa, southeast of Shonto, close to the 1882 Reservation line), down Polacca Wash toward Red Lake and Payutomo (Newberry Mesa) to the Little Colorado River and Grand Falls, and to Bird Spring 15 miles east of Leupp. He further testified that in the summer of 1934, there were other Hopi outfits operating around Shonto, including Scott Qotsmasa, Ralph Hootiwa, Alfred Puhuyesva, Roger Qotshaytiwa, Tukekwaptiwa, Ross Maqaya, Jacob Coin and Herbert Hamana, Saahu, going progressively northwest. In 1934–1935, when the family took cattle to the railroad for sale, they would corral cattle at a place called Sunshine, northwest from Meteor Crater (12–15 miles south of Leupp).

The family also had 25–30 horses which were allowed to freely roam and were rounded up once a year. The horses would graze in Hopi Buttes, east and west of the road from Winslow to Musangnuvi, 10 miles in a northeasterly direction from Dilkon, toward Indian Wells, but did not go as far as the road from Keams Canyon to Holbrook (Highway 77). Other horses went in a southeast direction from Dilkon or in the southwest direction toward Winslow. Further, the family and other Hopis had about 60 mares grazing around a butte named Sustavangtukwai, eight miles northeast of Isvatukwi, six miles south of Piitukwi. 11 TT 1719–52 (Deposition of Lomayesva). This testimony does not establish that the horses grazed south of the 1882 Reservation border, since the Hopi Buttes straddle the southern border of the 1882 Reservation.

62. 11 TT 1773–74 (Deposition of R. Lomayesva).

63. Dr. Godfrey testified that the summer range was within the 1882 Reservation area, but that SCS reports indicate that cattle drifted south to lower elevations in the winter. 4 TT 529–30 (Dr. Godfrey). As discussed, these reports do not establish that grazing took place south of the 1882 Reservation. Although Dr. Godfrey testified that 1882 Reservation cattle would have grazed south to the Colorado River, which was a "natural boundary", he did not establish that this grazing actually took place in 1934. 4 TT 534 (Dr. Godfrey). Dr. Godfrey stated,

Well, I don't think I've drawn a boundary. I've tried to represent on the map some fluid

ny contradicted the Hopi claim that Hopi livestock was grazing south of the 1882 Reservation.[64]

The Court concludes that Hopi livestock did not graze south of the 1882 Reservation in 1934.

C. *West of the 1882 Reservation:* The Hopi Tribe contends that Moenkopi Hopis used about 700,000 acres west of the 1882 Reservation for grazing. The Tribe claims that Hopis herded on the Kaibito Plateau north of the Moenkopi Wash, on the northern ends of Moenkopi Plateau, Coal Mine Mesa, and south of Moenkopi Wash throughout the rest of the area, including Ward Terrace. The Hopi Tribe also contends that cattle owned by Third Mesa Hopis grazed west of the 1882 Reservation, in the southern part of the area.

The Navajo Nation, in general, argues that the area of use is greatly exaggerated, since the Moenkopi Hopis had approximately 3,000 sheep units of livestock, which would have allocated over 230 acres per Hopi sheep unit, "a preposterous assertion in view of the intensive use of the area by Navajos." Also, the Navajo Nation argues that use of such an extensive area would have been sporadic and irregular, and that cattle were permitted to drift unsupervised.

The Court will examine both Hopi and Navajo grazing in nine areas: Pasture Canyon, Ward Terrace, western and northern Moenkopi Plateau, southern and central Moenkopi Plateau, the Bakalo (or Hollow Place), the Little Bakalo, Coal Mine Mesa, Moenkopi Wash/Kerley Valley, and areas north of Moenkopi Wash.

1. *Pasture Canyon*

The Hopi Tribe introduced testimony [65] and documentation [66] that Hopis were grazing in and around Pasture Canyon. Although a Navajo testified that he did not see Hopis grazing *east* of Pasture Canyon

uses at this time. The lines that I've drawn are to indicate vicinities. I will be the first one to admit that they may be overinclusive, and they may also be underinclusive. The documentation talks about vicinities. And a line has to be drawn somewhere. 4 TT 536–37 (Dr. Godfrey). The Court has no basis on which to accept Dr. Godfrey's estimate of grazing areas, which may be overinclusive.
Dr. McCawley's testimony was similarly based on government documents which do not establish that Hopi livestock grazed south of the 1882 Reservation in 1934. He testified that cattle would have grazed down along the [Little] Colorado River and to the southern portions of the Hopi Buttes, due to forage availability and lack of artificial boundaries, not on information that the grazing in these areas actually occurred in 1934. 10 TT 1525–47 (Dr. McCawley) (area surrounding confluences of Oraibi, Polacca, and Jeddito Washes was a "documented use area"). Dr. McCawley did not make efforts to corroborate the information in the documents on which he relied. 10 TT 1553 (Dr. McCawley).

**64.** Gene Price, a Navajo herding south of the 1882 Reservation in 1934 in LMU5, testified that he did not see any Hopi livestock from Tovar Mesa to Tolani Lakes. 27 TT 3864–66 (Price). Jack Clark, a Navajo herding in LMU7 in the mid–1930's, testified that he did not see any Hopi livestock while herding along the southern border. 28 TT 3943–50 (Clark).

**65.** Roger Honahni testified that Gaseoma, Siletstiwa, Wesley Seguiva, Teddy Tomosie, Talesmaenewa, Naseyouma, Phillip Pongyawyma and Logan Loma grazed sheep beyond Moenkopi Canyon (Moenkopi Wash) to the north. 3 TT 401 (Deposition of R. Honahni). Further, Pongyagoitewa, Seweyumptewa, Danakhoinewa, Naseyouma, Lomaquaptewa, Kelhongnewa, Sewiltima, and Natwantewa herded their sheep up to Pasture Canyon. 3 TT 402–05 (Deposition of R. Honahni).

Ira Naseyouma testified that his father grazed sheep in the Pasture Canyon, and that Kyarsyawma's father grazed his horses in Pasture Canyon. 10 TT 1679–83 (Deposition of I. Naseyouma). This was contradicted by the testimony of Ira's brother, Guy Naseyouma, who testified that his father's sheep were not grazed in the Pasture Canyon area until after 1937. Guy Naseyouma's testimony was corroborated by Roger Nasevaema, who lived with Ira and Guy's father, Naseyawma, in 1936, who stated Naseyawma grazed sheep southeast from the village on the far side of the wash. 2 TT 263–64 (Nasevaema).
*See also,* 7 TT 1152–53 (Dr. Adams) (Site 79, Hopi sheep corral visible in aerial photographs; Hopi rock art present); 10 TT 1514, 1519 (Dr. McCawley) (Pasture Canyon used by Hopis, based on water and range availability); Ex. 719, pp. 13–14 (McCawley report) (Pasture Canyon a "documented Hopi use area"; areas surrounding Pasture Canyon "maximum likelihood use area").

**66.** Gordon Page reported in 1937 that two bands of Hopis (Big Phillip [Pongyawma] and Puhugnovia) grazed in Pasture Canyon. Ex. 461. The Navajo Nation argues that there is no indication of where in Pasture Canyon this occurred, whether this occurred prior to 1937, nor whether the Hopis were successful.

in the 1930's,[67] the preponderance of the evidence reflects that at least two Hopi outfits grazed their livestock in Pasture Canyon in 1934.[68]

The evidence shows that Navajos were grazing in and around Pasture Canyon as well.[69] Dr. Russell's investigation revealed a number of Navajo Camps which had lived or herded inside Pasture Canyon.[70] The Court finds that Camps 11,[71] 96,[72] 123,[73] 172,[74] 178 [75] and 229 [76] grazed in or around

67. *See*, 26 TT 3722 (Alex Morez).

68. Also, the Navajo Nation admits that the Hopis had fields on the floor of Pasture Canyon north of the reservoir and south of the government pasture.

69. Ex. 3248, the LMU3 Consumption Group Map, shows many camps on both sides of Pasture Canyon. Ex. 3175, p. 1108, the LMU3 Range Management Report, dated April 1937, identified five Navajo families with over 3,000 sheep units living and herding at Pasture Canyon in the summer. (Three of these families are designated as summering at the "head of Pasture Canyon", two to three miles to the north of the claimed Hopi exclusive area.) Further, Ex. 451, Gordon Page's 1937 report, *Moencopi Village Stock Operators and Range*, states, "[Hopi] sheep were also ranged through Pasture Canyon to the well at the upper end of the canyon [until twenty years ago]. At the present time two bands attempt to use range in this area, but report that Navajos living nearby have exerted pressure against Hopi grazing use."

70. The Hopi Tribe complains that Navajo expert Dr. Scott Russell conducted his archeological analysis and follow-up interviewing on the eve of trial, that the archeological site forms were produced to the Hopi Tribe during trial, and that the evidence is therefore entitled to little weight. The Navajo Nation argues that Dr. Russell's opinions and methods were disclosed by lengthy reports before trial, that the Hopi Tribe declined to take Dr. Russell's deposition after additional fieldwork had been done, and that Hopi expert witnesses also did additional work after initial reports had been disclosed.

The Hopi Tribe further claims that the information from Dr. Russell's interviews is not credible: the Hopis claim that Dr. Russell asked leading questions, left out information contradicting his opinions, and that his principal informants did not testify at trial.

The Court denied the Hopi Tribe's motion to preclude the testimony of Dr. Russell, provided ample time for the Hopi Tribe to prepare for cross-examination, and indicated it would entertain a request to take Dr. Russell's deposition on the additional material before cross-examination. *See* 15 TT 2249–61. The Hopi Tribe did not request additional time or leave to take Dr. Russell's deposition. The Hopi Tribe was able to effectively cross-examine Dr. Russell and present evidence contradicting his opinions.

Dr. Russell's general findings are represented in Ex. 3575 (camp lists, site forms, site maps, and photos of Navajo camps), and Ex. 3570 and 3571 (maps showing location of Navajo sites).

71. *Camp 11:* Dr. Russell testified that Harrison Knight and his family had rights to the "Many Peaches" farming allotment in Kerley Valley, but had their primary summer residence at Site 3–11 on the eastern edge of Pasture Canyon. Although the site is currently the parking lot for the rodeo area in the Tuba City fairgrounds, there was evidence of a hogan and a corral area. They herded on both sides of and into Pasture Canyon, and east toward Greasewood Lake. 17 TT 2525–28 (Dr. Russell). The Hopi Tribe did not contest the location of the residence or herding of this Camp in its response to the Navajo Proposed Findings.

72. *Camp 96:* Bill and Martha Sawyer, related to Camp 11, resided adjacent to Site 3–11, and also herded in and around Pasture Canyon. 18 TT 2598–99 (Dr. Russell). The Hopi Tribe did not contest the location of the residence or herding of this Camp in its response to the Navajo Proposed Findings.

73. *Camp 123:* Dr. Russell testified that George and Mary Bancroft, Richard and Helen Tsinnie, and children of both families summered near Pasture Canyon at Site 3–79, from which they used the southern part of Pasture Canyon. The Hopi Tribe admits that this Camp most likely grazed within the claimed Hopi exclusive use in 1934.

74. *Camp 172:* Dr. Russell testified that a Navajo named Slim Mexican lived about ½ mile east of Pasture Canyon in the summer of 1934, near the present rodeo grounds, and herded into the lower and upper canyon, and utilized Pasture Canyon for water. 18 TT 2647 (Dr. Russell). The Hopi Tribe did not contest the location of the residence or herding of this Camp in its response to the Navajo Proposed Findings.

75. *Camp 178:* Dr. Russell testified that Ray McCoughey (aka "McCally") and his family farmed at "Many Peaches" in Kerley Valley in the summer, and had two residence sites in Pasture Canyon. First, the family resided at Site 3–10, on the east edge of Pasture Canyon, and at Site 3–25, southeast of the canyon. Although neither site had any remains, Victor Saganitso took Dr. Russell to these areas. 18 TT 2667–69 (Dr. Russell). The Hopi Tribe did not contest the location of the residence or herding of this Camp in its response to the Navajo Proposed Findings.

76. *Camp 229:* Dr. Russell testified that Cyclone Morez had a residence, two fields and a natural

Pasture Canyon in 1934; Camp 14 [77] did not.

The Navajo Nation also claims other camps brought their stock into Pasture Canyon for water, including Camp 41 (Saganitso), Camp 106 (S. Begody), Camp 123 (Bancroft), Camp 139 (F. Begody), Camp 149 (Begay), and Camp 166 (Chief). However, these camps all resided and herded in other areas, and will be considered elsewhere.

The Court finds that Pasture Canyon was jointly used by Hopis and Navajos in 1934.

### 2. Ward Terrace

The Hopi Tribe claims that Ward Terrace was used by a number of Hopis in 1934. The Court finds that the Dallas and the Humetewa brothers used this area, as evidenced by testimony [78] and government documents.[79] This renders plausible the

---

rock corral in the Castle Rocks area, on the west side of Pasture Canyon at Site 3–13. 18 TT 2688–89 (Dr. Russell); 26 TT 3717–22 (Alex Morez). The Hopi Tribe did not contest the location of these residence and herding in its response to the Navajo Nation's Proposed Findings.

77. *Camp 14:* Dr. Russell testified that Albert Dugai and his family had a summer farm and residence in Kerley Valley, and another residence on the east rim of Pasture Canyon, designated as Site 3–12. Kenneth Dugai, Albert's son, showed Dr. Russell several hogan rings and a corral area at the site. The family herded both above and below the Pasture Canyon reservoir, but primarily to the east toward Greasewood Lake. 17 TT at 2545–50 (Dr. Russell).

The Hopi Tribe argues that the hogan at Site 3–12 did not exist in 1934, as it was not visible on the aerial photographs. Further, Charlie Huskon testified at deposition that he grazed his livestock at Shadow Mountain (west of Highway 89) in the summer around 1934, and that Kenneth Dugai also grazed there. 22 TT 3163 (Dr. Russell).

78. The testimony cited by the Hopi Tribe is inconsistent as to the number of Hopis herding on Ward Terrace. Roger Honahni testified that Henry, Robert and Steven Dallas, Henry, Alec, Eric, and James Humetewa, Samuel Shing, John Gaseoma, John Gashyesva, and John Jenkins grazed their cattle on Ward Terrace and in the area near Cameron. 3 TT 364 (Deposition of R. Honahni).

William Numkena testified that his father and uncles, Lewis and Earl Numkena, Ray Nasetoynewa, and Edwin Kaye, Roger, Roland and Stanley Honahni, Brian Gilbert, Frank Nutema, George Nuvayestewa, James Humetewa, Henry and Robert Dallas, Roger Q, and Honyamptiwa grazed their cattle on Ward Terrace. 6 TT 971 (Numkena).

Ira Naseyouma testified that Henry and Steven Dallas (who had about 300 cattle), and Henry and James Humetewa grazed stock on Ward Terrace. He further testified that the

Dallas brothers built a house, corral, and two dams south of Secuva, and that their cattle grazed from Secuva to the highway (east of Cameron), the Little Colorado River, Accowsie Spring (on the western escarpment of Moenkopi Plateau), springs on the east side of cliffs at Waawala, and a spring called Lowava, south of Tuusiva. 10 TT 1631–32, 1665–67 (Deposition of I. Naseyouma).

James Humetewa testified at deposition that in 1934, his father and he and his brothers Alec, Henry, and Eric had about 129 cattle and four horses, and grazed on a lower plateau near Cameron, towards Sand Springs, eastward to the cliff at Moenkopi Plateau and Ward Terrace, and north to five miles south of Moenkopi Wash. Robert and Henry Dallas (his uncles) were using the same area in 1934, *although no other Hopis used this area.* He also testified that the cattle would go to the Little Colorado River south of Cameron if they could not find water, south of Cameron. 6 TT 1922–27 (Deposition of J. Humetewa). James Humetewa's testimony is the more credible as to individuals grazing in the Ward Terrace area.

*See also,* 8 TT 1191–95 (Dr. Adams) (Site 83 used by Dallas brothers, Humetewa family, Roger Honahni, Sam Shing, and Bryant Gilbert in 1934; Sites 140 and 158 were in use before 1934); 10 TT 1517 (Dr. McCawley) (opinion of Hopi presence based on government documents, forage and water resources); Ex. 719, pp. 10, 19–20 (McCawley report) (Ward Terrace "maximum likelihood Hopis use area").

79. Gordon Page's 1937 report stated that Henry Dallas was reported to drift his cattle west of the Moenkopi Plateau rim, but the report could not be confirmed. Ex. 451 at 2, *Moencopi Village Stock Operators and Range,* 4/15/37. The report also indicates that this area was shared with Navajo herders.

Ex. 2676, a report dated April 16, 1937 by D.G. Anderson, Junior Range Examiner, states, "The present range use by the Hopis is Coal Mine Mesa, around the Moencopi Village, and Ward Terrace. This range is also used by Navajos."

testimony of several Navajos that they did not see Hopis below Tonali on Ward Terrace during the mid–1930's,[80] because there were a limited number of Hopis in the area.

Navajos also grazed their livestock in the Ward Terrace area. Dr. Russell's investi-

gation revealed four Navajo Camps on Ward Terrace. The court finds that Camps 13 (at Site 3–48)[81] and 168[82] grazed their livestock in the area; Camps 49[83] and

80. *See,* 24 TT 3456–59 (Canyon), 27 TT 3783 (Huskon), and 25 TT 3562, 3574 (Keetso).

81. *Camp 13:* Dr. Russell testified that the Seschilie family occupied several residence sites on Ward Terrace since the 1920's, to which Dr. Russell was taken by King Seschilie, son of Lester Seschilie (aka Lester "Curly Hair"). 17 TT 2537, 2544 (Dr. Russell). In the wintertime, the family resided at Site 3–36, south of Ward Terrace (in the southwest corner of the claimed Hopi exclusive use area). Two hogan rings, a sheep corral, and a cattle corral remain. 17 TT 2530 (Dr. Russell). At the time of trial, the Seschilie family was using a cattle corral about a quarter mile north from that site. 17 TT 2532 (Dr. Russell). The Seschilie family also lived at Site 3–48 on Ward Terrace in the summer time. That site consisted of three hogans, a sweat lodge, and a corral area in a rock enclosure, and was used as a summer herding area. 17 TT 2540–42 (Dr. Russell). Dr. Russell also testified that the Seschilie family resided in and used a number of other sites in the summer time on the Moenkopi Plateau. These sites will be addressed in a later section of this order.

While Dr. Adams conceded that Seschilie lived on Ward Terrace during the 1930's, 8 TT 1296–97 (Dr. Adams), the Hopi Tribe argues that the Seschilie family did not reside in this area until after 1934. Dr. Adams testified that the only structure at Site 3–36 in 1934 was a frame house used by Hopi cattle ranchers, which was identified through the aerial photographs (Adams Site 83). 8 TT 1191–1196 (Dr. Adams). Louise Dugai, a member of the Seschilie family, told Dr. Russell that a frame house had burned down at this site, 22 TT 3157 (Dr. Russell), and Dr. Kelley mapped an ashy area in the place where Dr. Adams mapped the frame house. Ex. 3575, Camp 13, Site Form 3–36, p. 402117. This was not an "ash dump" characteristic of Navajo sites, because it was not on the northeast side of the hogan door. 15 TT 2296 (Russell) (ashes are always dumped to the northeast of the hogan door). The Hopi Tribe contends that while there are discrepancies in the recollections of the Navajo informants regarding the year the Seschilies first started living at Site 3–36, the recollections of the Hopi informants were very clear that the Seschilie family did not move to the area until 1935–36, when the Ward Terrace cattle outfit split over support for the Indian Reorganization Act, and the Dallas brothers who remained on Ward Terrace hired the Seschilie family to help tend the cattle. Ex. 651, App. I, Site 83 (Adams report). The Court finds that the preponderance of the evidence shows that Site 3–36 was not occupied by Seschilie in 1934.

The Hopi Tribe also argues that the structure at Site 3–48, although visible on the aerial photographs, was not built by Navajos. Although round stone structures were built by Hopis as well, 7 TT at 1102 (Dr. Adams), Ex. 651, p. 71–74 (Adams report), and Hopi doors often face east as in Navajo hogans, Dr. Adams also stated the field or farm houses were "nearly always square or rectangular." Ex. 651 at pp. 51, 59 (Adams report). Further, the Hopi Tribe argues that the information from Navajo informants is not credible as to this site. *See,* 22 TT 3166–70 (Dr. Russell) (King Seschilie did not identify Site 3–48 during the 1986 interview, but later identified the site in 1989; Ward Seschilie did not identify Site 3–48; Jerry Lewis identified the site as used by Doris Seller, a member of Camp 23, but Doris Seller did not mention living on Ward Terrace around 1934; Lena Reed Dallas, a Navajo woman married to Robert Dallas told Dr. Russell that her family lived at Site 3–48 "during the period of the goat reduction.") The Hopi Tribe did not present any evidence of Hopi use of this site, and James Humetewa, a Hopi, told Dr. Adams that Seschilie lived at this site in 1933. 8 TT 1298–99 (Dr. Adams). The preponderance of the evidence shows Site 3–48 was occupied by Seschilie in 1934.

82. *Camp 168:* Dr. Russell testified that Grace Skacy, one of John Skacy's wives, resided at Site 3–56 in the winter and Site 3–52 in the summer, just west of the claimed exclusive area, and grazed her sheep within the exclusive area. 18 TT 2631–32, 2639 (Dr. Russell). Dr. Russell testified that there were remains of a sweat lodge and scattered wood from a hogan at Site 3–52 (to which he was taken by Graze Yazzie, Grace Skacy's daughter), and several hogan depressions and a corral at Site 3–56.

The Hopi Tribe argues that Site 3–52 was not present on the aerial photographs, though Site 3–56 (outside of the exclusive use area) was visible. However, the absence of a structure on the aerial photographs is not determinative. The preponderance of the evidence establishes that both sites were in use in 1934.

83. *Camp 49:* Dr. Russell testified that Frank Johnson and his family came to Kerley Valley in the summer to farm his mother's field (Mary Johnson, Camp 273). Frank Johnson had a summer residence at Site 3–5 on the northern Ward Terrace (not within the exclusive area), and claims to have herded his sheep inside the claimed Hopi exclusive area. The family reported getting water in Tonidigishi Canyon and Moenkopi Wash. 17 TT 2567–69 (Dr. Russell). However, Dr. Russell agreed that the Moenkopi

170 [84] did not graze on Ward Terrace.

### 3. *Western and northern Moenkopi Plateau*

The Court finds that Navajos and Hopis jointly grazed throughout the Ward Terrace area in 1934.

The Hopi Tribe claims that numerous Hopis grazed their livestock on the western and northern Moenkopi Plateau. The evidence clearly supports this conclusion.[85]

There is also documentary [86] and testimonial evidence that Navajos grazed in this

Wash would have been their principal water sources, and that Tonidigishi was used only occasionally. Further, Camp 69 stopped using this area in 1936 or 1937, and it was thus not their "customary use area". 22 TT 3180–81 (Dr. Russell). The Court finds that Camp 49 did not use the area on Ward Terrace within the Hopi claimed exclusive use area.

**84.** *Camp 170:* Dr. Russell testified that Nalcody Biye (aka Begay) had a large field area on the northern part of Kerley Valley, west of the government farm, and a large stone house, a hogan and several corrals at Site 3–9 (north of the claimed exclusive area). The family had three summer herding sites on Ward Terrace (Sites 3–6, 3–7, 3–8). There was a corral and several residential structures at Sites 3–6 and 3–7, and a large stone house, a hogan, and a corral at Site 3–8. Mr. Biye was also known as "Mr. House" due to the stone houses he had built. Dr. Russell testified the family herded into the claimed Hopi exclusive area and sometimes watered the livestock at Salt Springs. 18 TT 2640–44 (Russell).

The Hopi Tribe argues that the evidence shows that the customary grazing area of this Camp was west of the exclusive Hopi area, and that they only grazed within the exclusive area when vegetation became scarce. Tom Kibahi, a member of the Camp in 1934, indicated to Dr. Russell that they herded around and to the west of the sites, and that the main water source was Moenkopi Wash. Ben Bennally, another member of the Camp, told Dr. Russell that they would herd on top of Moenkopi Plateau when the vegetation was scarce. 22 TT 3205–12 (Dr. Russell).

The Court find that Camp 170 did not graze its livestock on Ward Terrace in 1934.

**85.** The Hopi Tribe introduced substantial testimony that Hopis grazed livestock in this area. Roger Honahni testified that Hopi cattle got water at Dusovah, Tsinngavah, and Du–wee–Veh–Pahu (in the vicinity of Tonali, on the western Moenkopi escarpment). 3 TT 370 (Deposition of R. Honahni). His father had a sheep camp at Tsinngavah. 3 TT 400 (Deposition of R. Honahni). Honahni also testified that there were cattle corrals one and one-half mile south of the village on the northern plateau, and another up the canyon by Cottonwood Springs, eight miles east from the village. 3 TT 391 (Deposition of R. Honahni).

William Numkena testified that a number of Hopis grazed their cattle south of the village on Moenkopi Plateau, and would corral the cattle two or three miles south of Moenkopi Village. 6 TT 971–73 (Numkena).

Ira Naseyouma testified that his father had a number of sheep corrals: one was just east of Posiwlelena (on the northern Moenkopi Plateau), and another four miles west of Posiwlelena, which was used by many people. 10 TT 1593, 1600–01 (Deposition of I. Naseyouma). He also testified that Pongyangoytiwa (Palmer), Teddy Honyamtiwa and Siwiyamtiwa grazed south of the wash and north of Owl's Cap, and that Willard Holmes, Logan Loma, and Benny Tiwa grazed northeast of Highway 264, west of Coal Mine Canyon, and south of the wash. 10 TT 1613–14 (Deposition of I. Naseyouma). Further, he testified that "almost everyone's" cattle grazed near a spring called Tuusiva, along the western escarpment of the Moenkopi Plateau near Singaba. 10 TT 1655–57 (Deposition of I. Naseyouma). However, Ira Naseyouma had an eye operation in 1934 that required him to spend several months in the spring of 1934 in the hospital and at home, 11 TT 1690–92 (Deposition of I. Naseyouma), lending his account of where sheep were grazed in 1934 less credible.

Guy Naseyouma testified that his horses grazed toward Owl's Cap past Crater Well (about two miles from Moenkopi Wash), and that he herded his father's 80–100 sheep in this same area. 11 TT 1811–17 (Deposition of G. Naseyouma). His father's sheep corral was northwest of where the bridge on the road to Oraibi crossed the wash (by the present day rest area), and he also herded in this area. 11 TT 1809–11, 1834 (Deposition of G. Naseyouma).

*See also,* 4 TT 540–546 (Dr. Godfrey); 7 TT 1159 (Dr. Adams) (Site 145, rock art dated to 1933 and informants indicated Hopi cattle and sheep watered here); 8 TT 1190–91 (Dr. Adams) (Site 141, a water catchment area used as livestock area).

**86.** Ex. 3248, the LMU3 Consumption Group Map, shows 23 camps on western and northwestern Moenkopi Plateau. Further, Ex. 451, Gordon Page's 1937 report, *Moencopi Village Stock Operators and Range,* states, "At the present time, due to drought conditions, eight other Navajos groups from the vicinity of Grey Mountain have moved in to use.... the springs along the western scarp of Moencopi Plateau ...."

area. Dr. Russell's investigation revealed numerous Navajo Camps using this

**87.** Dr. Russell testified that many camps had deviated from their usual use areas in the 1930's, either by moving into Ward Terrace, Moenkopi Plateau or Coal Mine Mesa when water and forage in the usual use areas failed. The Hopi Tribe thus argues that Dr. Russell's testimony failed to establish that the Navajo activity was regular and on-going, and that Navajos had deviated from their previously established customary use areas. However, the rights and interests of the Tribes in the 1934 Reservation are tied to their use in 1934, as long as that use was sufficiently intensive.

**88.** *Camp 13:* Dr. Russell testified that the Seschilie family occupied several residence sites since the 1920's, to which Dr. Russell was taken by King Seschilie, son of Lester Seschilie (aka Lester "Curly Hair"). 17 TT 2537, 2544 (Dr. Russell). Dr. Russell testified that the family used Site 3–50 in the summertime, located on the Moenkopi Plateau just south of Seller Spring. There are several hogan rings, a sweat lodge, and an extensive trash area are visible there today. 17 TT 2533 (Dr. Russell). The daughter of Louise Skacy, who took Dr. Russell to this site as well, indicated that Louise Skacy lived with Lester Seschilie here as early as the mid 1920's. 18 TT 2634 (Dr. Russell).

The Seschilie family also lived at Site 3–51, a summer residence for herding sheep. When some of the family would go to the wife's farm in Kerley Valley, the others would take the sheep to this site, closer to Kerley Valley, less than a mile northwest of Tonidigishi Spring. 17 TT 2536 (Dr. Russell). The family lived in a tent in this area, so the archeological remains were minimal, including rocks used for the base of the tent, a hearth area, and a few areas of trash. 17 TT 2537 (Dr. Russell).

The Navajo Nation also claims that the Seschilie family had two residences on Ward Terrace: a winter site at Site 3–36, and a summer site at Site 3–48. These sites are discussed in the section on Navajo presence on Ward Terrace.

The Hopi Tribe contends that the Seschilie family did not reside in this area until after 1934, arguing that Site 3–50 does not appear on the aerial photographs. Further, the Hopi Tribe argues that since the Seschilies resided at Site 3–51 in conjunction with Site 3–50, if site 3–50 was not present in 1934, neither was Site 3–51.

The preponderance of the evidence shows that Camp 13 resided and grazed in this area in 1934.

**89.** *Camp 15:* Dr. Russell testified that Silas and Mary Lee resided at Site 3–69, at the extreme west end of Kerley Valley. There are no archeological remains, as the location is now covered by municipal sewer ponds. The family hobbled their horses and mules at night on top of the Plateau. 17 TT 2550–52 (Dr. Russell). The Hopi Tribe did not dispute the location and

area in 1934.[87] The Court finds that Camps 13,[88] 15,[89] 36,[90] 44,[91] 63,[92]

grazing area of this camp in its response to the Navajo Proposed Findings.

**90.** *Camp 36:* The Goldtooth family lived in this area year-round. 17 TT 2555–57 (Dr. Russell); 24 TT 3424–68 (Lena Goldtooth Canyon). Dr. Russell identified three sites used by Camp 36: Sites 3–32, 3–28 and 3–62. Only Site 3–32 ("Goldtooth Springs") is within the claimed Hopi exclusive use area.

Lena Canyon also recalled other Navajo families who herded near their residences. Adolph Heavy (the father of both of Goldtooth's wives) farmed at Goldtooth and resided at both Goldtooth and Goldtooth Springs); Akaali (married to two of Adolph Heavy's other daughters), resided and farmed at Goldtooth and resided at Goldtooth Springs); Tsiishchili ("Seschilie" or "Curly Hair"), lived near Seller Springs and on the Ward Terrace; the Talker and Deer Water lived near Tonali; Naa'tah lived at Tonali. Canyon also testified that she did not see Hopis in either the Goldtooth or Goldtooth Springs area. 24 TT 3444–63, 3467–68 (Canyon).

The Hopi Tribe contends that the Goldtooth family only resided about four miles to the south of the Hopi exclusive area at "Goldtooth Ranch", at Sites 3–28 and 3–62, at which a field was visible on the aerial photographs. Ex. 3547 (Site U13); Ex. 3549 (Site U13).

The Court finds that a preponderance of the evidence indicates that the Goldtooth Camp used Site 3–32, and that other Navajos used the land in this area in 1934.

**91.** *Camp 44:* Dr. Russell testified that Jake Bracker and his family lived at Site 3–72 during the summer at "Standing Big Tree" at Joe Notooth's farming site, immediately north of the Hopi "exclusive use area". (Jake's wife, Leila, was the daughter of Joe Notooth, and resided very close to Notooth during parts of the year). 17 TT 2564–65 (Dr. Russell). Camp 44 herded into the "exclusive use area". 17 TT 2565 (Dr. Russell). Camp 44 also lived at another site on the Moenkopi Plateau by Seller Spring, Site 3–58; although this site had no archeological remains, Dr. Russell was taken to this site by Jerry Lewis, son of Leila Bracker. 17 TT 2565 (Dr. Russell).

The Hopi Tribe states that this camp was related to Camp 173 and typically moved with it, 17 TT 2564–67 (Dr. Russell), and that there is insufficient evidence to conclude that either Camp 44 or Camp 173 resided or grazed within the "exclusive area". These arguments will be addressed with reference to Camp 173.

**92.** *Camp 63:* Dr. Russell testified that John Canyon and his family farmed in Kerley Valley in the summertime, north of the school farm. Dr. Russell also testified that the members of this

96,[93] 124,[94] 168,[95] 171,[96] 173 (at Sites 3–78, 3–41, 3–70, and 3–75),[97]

camp resided in three areas: south of the wash at Site 3–63, near the home of John Skacy and slightly north of that at Site 3–65, at which the camp had a hogan and a sheep corral. Only the sheep corral is still present. The family also had a summer residence on top of Moenkopi Plateau at Site 3–66, to the east of Site 3–65, at which they had a corral. From the two corrals, the family herded on the northwest corner of Moenkopi Plateau and south to the Tonidigishi area. 18 TT 2585–89 (Dr. Russell).

The Hopi Tribe contends that there is insufficient evidence that Camp 63 resided or grazed south of Moenkopi Wash in 1934, based on its claim that John Skacy did not live south of the Wash. Since the Court has found that Skacy did not live south of the Wash in 1934, the Court finds that Camp 63 also did not reside at Site 3–63 in 1934. However, the Hopi Tribe did not introduce any evidence to disprove the Navajo claim that Camp 63 also resided at Site 3–66, and herded on the northwest corner of Moenkopi Plateau. The Court thus finds that Camp 63 used this area in 1934.

**93.** *Camp 96:* Dr. Russell testified that Bill and Martha Sawyer had a corral at "Many Peaches" in Kerley Valley (Site 3–37), where Bill's ancestor, Charlie Ettsity, had farming rights. They herded on the Moenkopi Plateau, south of the wash. 18 TT 2599 (Dr. Russell). The Hopi Tribe did not dispute the location of this camp in its response to Navajo Proposed Findings.

**94.** *Camp 124:* The families of Silas Talker and Maxwell Yazzie, and John and Albert Denetso used the Tonali area for herding in the summer, and lived just south of Seller Spring. The site was not numbered because John Denetso, Dr. Russell's informant, was ill and could not take Russell to the site. Denetso told Russell that they grazed on the Moenkopi Plateau, between Tonidigishi and Goldtooth Springs. 18 TT 2618–19 (Dr. Russell).

The Hopi Tribe argues that this information was contradicted by other informants: Robert Blackhair and Billy Yazzie, brothers of Maxwell Yazzie, told Dr. Russell that Maxwell had a farm at Moenave, but did not know about the locations of the other camp members. 23 TT 3280 (Dr. Russell). Further, the LMU3 Range Management Report, Ex. 3175, indicates that Maxwell Yazzie lives "year long five miles west of Cameron … Cattle on east side of Gray Mountain." 22 TT 3281 (Dr. Russell).

Although this information indicates that Maxwell Yazzie did not use the Tonali area in 1934, the Hopi Tribe did not contradict the other Camp members' use of the area, and the Court finds Camp 124 used the area in 1934.

**95.** *Camp 168:* Dr. Russell testified that John Skacy's wives, Louise and Grace, each had their own herd, and herded in different areas. Grace lived with John Skacy's mother in Kerley Valley; the family had farming plots north of the Moenkopi Wash, and a house on the south side

of the Wash, with which several corrals and sweat lodge areas were associated (Site 3–19). 18 TT 2630 (Dr. Russell). They also had a residence site on top of Moenkopi Plateau, where they herded, and at which was located a stone-bottom hogan and stone corral (Site 3–53). 18 TT 2631–32 (Dr. Russell).

The Court previously found that John Skacy did not have a house south of the Wash in 1934. However, the Hopi Tribe did not challenge the location or herding area at Site 3–53, and the Court finds that Camp 168 grazed livestock in this area.

**96.** *Camp 171:* Dr. Russell testified that Fred Little Smith and his family moved to the Tonali–Seller Spring area in summer for water and herding. Agnes Bighorse, a daughter of Fred, told Dr. Russell that they lived a half a mile south of Seller Spring; because Dr. Russell did not visit the site, it was not numbered. 18 TT 2646 (Dr. Russell). The Hopi Tribe did not contest the location of this site in its response to the Navajo Proposed Findings.

**97.** *Camp 173:* Dr. Russell testified that Joe Notooth and his family had two primary farming areas. One was at Standing Big Tree (Site 3–70) with an associated field and corral (Site 3–71) 18 TT 2648 (Dr. Russell). Notooth also had a farm in Kerley Valley, north of the Wash and west of the government field; site 3–67 was a residence and site 3–75 was a sheep corral south of the wash associated with this field. 18 TT 2650 (Russell). Dr. Russell testified that Notooth and his daughter Mrs. Bracker (Camp 44) also utilized sites in the Tonidigishi area at Site 3–78, and had a storage pit at Tonali at Site 3–41. 18 TT 2652–53 (Dr. Russell). Also, the family had a residence, Site 3–55, and a corral area, Site 3–43, at a location called "Where the black plant grows." 18 TT 2653–54 (Dr. Russell) (a number of people told him this area was used by Navajo families, and Jerry Lewis informed Russell that Lewis' family had used the corral).

The Hopi Tribe argues that claims that Camp 173 resided at six different spring and summer sites are not credible; however, Dr. Russell explained that Notooth divided up his herd to utilize more than one grazing area at a time. 18 TT 2655, 22 TT 3212–56 (Dr. Russell).

The Hopi Tribe first challenges Notooth's presence at Site 3–55 and 3–43 (listed as Adams Site 110). Dr. Warburton testified that the lack of any mass-produced Euroamerican artifacts at Site 3–55 ("Where the black plant grows") indicated that it dated earlier than 1934. Ex. 3575, Camp 173, Site Form 3–55, p. 402205. 22 TT 3245–48 (Dr. Russell). Further, William Numkena testified that he never saw a Navajo hogan near Ironwood Springs (Site 3–55). 30 TT 4196–97 (Numkena). The Court concludes that Sites 3–55 and 3–43 were not used in 1934.

The Hopi Tribe also challenges Navajo use of Sites 3–78 and 3–41. Numkena testified he did

185,[98] 189,[99] 238,[100] and 273 (as to a grazing area outside Site 3–55),[101] grazed on the

northern or western Moenkopi Plateau in 1934, and that Camps 82,[102] 85,[103]

not see a Navajo hogan or house near the springs along the western escarpment of the Moenkopi Plateau. 30 TT 4201–04 (Numkena). However, there is substantial evidence that Navajos resided in this area in 1934, and the Court finds that Notooth used Sites 3–78 and 3–41 in 1934.

The Hopi Tribe acknowledges that Notooth herded in the Standing Big Tree area, and to the south on the southern Moenkopi Plateau. Numerous Hopi and Navajo informants placed Notooth in these areas. 7 TT 1054 (James Humetewa placed him on the southern Moenkopi Plateau); 23 TT 3394 (Dr. Russell) (Lena Begay, Notooth's daughter, told Russell that Notooth used the Standing Big Tree area and the southern Moenkopi Plateau); 23 TT 3396 (Dr. Russell) (Lelia Souie, Notooth's daughter, told Dr. Russell that Notooth lived at Standing Big Tree and farther east at Coal Mine Canyon, and the southern Moenkopi Plateau, including Goldtooth and Sand Springs); 28 TT 3912 (Nettie Nez) (Notooth resided and grazed on the southern Moenkopi Plateau); Ex. 660, p. E26470 (Sam Shing told Dr. Adams that Notooth lived in the Cow Springs area, east of the exclusive area); Ex. 660 p. E26501–02 (Willard Holmes recalled that Notooth farmed at Standing Big Tree). The Hopi Tribe admits that Camp 173 would have passed through the exclusive area in its travel between Standing Big Tree and the southern Moenkopi Plateau (and possibly the farm in Kerley Valley).

The Hopi Tribe did not contest that Site 3–75 was used by Notooth in 1934. The Court concludes that Sites 3–78, 3–41, 3–70, 3–71 and 3–75 were used by Notooth in 1934.

**98.** *Camp 185:* Dr. Russell testified that while Tony Bignose and his family farmed in Kerley Valley during the summer, they utilized the same residence site as Henry Billy of Camp 125 (Site 3–18), and hobbled the farm animals on top of the Moenkopi Plateau at night. 18 TT 2675–76 (Dr. Russell). The Hopi Tribe did not contest the location and herding area of this Camp.

**99.** *Camp 189:* Philip Tracy (and his brother Dan Tracy, designated as Camp 187) farmed on the western end of Kerley Valley, and herded livestock in the Tonidigishi–Tonali area in the summertime. 18 TT 2678–79 (Dr. Russell). The Hopi Tribe did not object to the location and herding area of this Camp in its response to the Navajo Proposed Findings.

**100.** *Camp 238:* Dan Bighorse (the son of Gus Bighorse) and his family herded in the Tonali area and had a residence site south of Seller Springs in the summertime. 18 TT 2689–91 (Dr. Russell). The Hopi Tribe did not object to the location and herding area of this Camp in its response to the Navajo Proposed Findings.

**101.** *Camp 273:* Dr. Russell testified that Mary Johnson farmed on the north side of the wash in Kerley Valley, and kept her sheep herd in that area. Her grandson, James Tsinnie (from Camp 184), helped with her fields, and had a house at Site 3–21, close to the diversion dam in Kerley Valley where he was employed to control water flow. Tsinnie also herded sheep and goats on the Moenkopi Plateau from a corral at Site 3–35, on the south side of Moenkopi Wash. 18 TT 2670–72 (Russell).

Site 3–21 cannot be counted as a Navajo residence site because James Tsinnie lived there only while employed to control the diversion dam; Dr. Russell did not consider the residence to be part of Tsinnie's "customary use area". 23 TT 3325 (Russell).

Dr. Russell testified that Site 3–35 was on a Navajo allotment, and cannot therefore be claimed by the Hopi Tribe. However, the area outside of the allotment on which Tsinnie herded can be claimed.

**102.** *Camp 82:* Dr. Russell testified that Scott Preston and his family lived in the Tonali area during the summer. This residence did not have a site number, as Dr. Russell was unable to visit the site with the informant, John Roberts. 17 TT at 2593–94 (Dr. Russell).

The Hopi Tribe argues that Camp 82 primarily grazed its livestock north of Tuba City (toward Preston Mesa), and only occasionally crossed Moenkopi Wash to graze on the Moenkopi Plateau. See 22 TT 3201–03 (Dr. Russell) (John Roberts told Dr. Russell that his family only "went to Moencopi Plateau once in a while"). This indicates that Camp 82's use of Moenkopi Plateau was not sufficiently intensive.

**103.** *Camp 85:* Dr. Russell testified that an individual named Joe Bush (aka, "the Seller") occupied two residences in 1934: he lived at Site 3–30, south of the Hopi "exclusive area", and at a site overlooking Seller Spring, an area named for his close residence to it. The latter site was not recorded with a site number, although Dr. Russell testified it was immediately next to Site 3–50. A number of informants mentioned that Joe Bush herded on the Moenkopi Plateau. 18 TT 2595–97 (Dr. Russell).

The Hopi Tribe argues that there is no evidence that Joe Bush had a residence at Seller Springs: there is no evidence of hogan remains, Ex. 3575, Camp 85, Site Form 3–50B, p. 402164, and it did not appear on the 1934 aerial photographs. Further, William Numkena testified that he saw no hogans near Seller Spring around 1934, 30 TT 4201–04, and Lena Goldtooth testified that after his wife died in 1929, the Seller moved back and forth between his son's home at Willow Springs and her family's home at Goldtooth. 24 TT 3464–65 (Can-

144,[104] and 299 [105] did not.

### 4. Southern and Central Moenkopi Plateau

The Hopi Tribe introduced substantial evidence that the central and southern areas of Moenkopi Plateau was grazed by Hopi livestock.[106] Although the Navajo Nation argues there is no credible evidence that Moenkopi Hopis grazed south of the Buck Pasture northern fence, the Court finds

yon). This latter testimony was confirmed by Margaret Goldtooth. Ex. 3609, p. 51–52.

The Court finds that Camp 85 did not use Moenkopi Plateau within the claimed Hopi exclusive use area.

**104.** *Camp 144:* Dr. Russell testified that Gus Bighorse's children, Tina, Bessie, and Floyd, herded in the Tonali and Tonidigishi area in the summer time. They lived in a shade or tent in the summer; the residence site was not numbered, as Dr. Russell did not visit the site. Gus Bighorse lived in Kerley Valley year round because he was blind, and some family members stayed with him and farmed during the summer. 18 TT 2625–26 (Dr. Russell).

The Hopi Tribe argues that there is insufficient evidence that Camp 144 herded in the Tonali area. Dan Bighorse, Gus's son, told Dr. Russell that Camp 144 did not have any livestock by 1934. Tina Butler, Gus's daughter, told Dr. Russell that Camp 144 was herding in the Tonali area, but had mixed up the sequence of events surrounding livestock reduction, and was not reliable for dates. 22 TT 3203–05 (Dr. Russell).

The preponderance of the evidence shows that Camp 144 did not use the Tonali area in 1934.

**105.** *Camp 299:* Dr. Russell testified that Mark Twain farmed in Kerley Valley and had a corral at Site 3–19, on south side of Moenkopi Wash, by the John Skacy house. Twain lived just west of Site 3–67 (designated as Camp 173). Dr. Russell testified that he grazed on the Moenkopi Plateau, but did not have the exact location of grazing, as most members of his family were deceased. 18 TT 2694–95 (Russell).

As previously discussed as to Camps 63 and 168, the Court found that John Skacy's house was not established until after 1934, and the preponderance of the evidence shows that Camp 299 did not use this area in 1934.

**106.** Roger Honahni testified that Earl and Walter Albert had stock south of Buck Pasture (around Hukvahklo), and still use the same area. 3 TT 359–60 (Deposition of R. Honahni). Roger Honahni testified that other Hopis grazed and watered cattle as far south as Hukvahklo before the Buck Pasture fence was built and that cattle got water at a small canyon named Masiskyavehk. 3 TT 365, 387–89 (Deposition of R. Honahni). Further, Honahni grazed his horses from Moenkopi Wash, south to Howell Mesa/Hukvahklo. 3 TT 407–08, 410 (Deposition of R. Honahni).

William Numkena testified that many Hopis went as far south as Masitsotsmo to round up cattle, 12 miles south of Moenkopi to Buck Pasture, and would use the dugouts at Buck Pasture. 6 TT 973, 976 (Numkena).

James Humetewa testified that Earl, Sam, and Lewis Numkena, Roger Honahni, Frank Nutima [Nuhtayma], Jackson Tewa, Edwin Kaye, Logan Loma, Frank Seumptewa, Kopulvu, Nasitoyniwa, Big Phillip, and Gaseoma would graze from Moenkopi Plateau to Sand Springs (on the 1882 Reservation). 6 TT 1029–30 (Deposition of J. Humetewa). Although this area is not specific, it appears to be on the southern Moenkopi Plateau.

Ira Naseyouma testified that Walter Albert had a corral 5–6 miles south of Buck Pasture, west of Howell Mesa, which was used in 1934. 10 TT 1602–03 (Deposition of I. Naseyouma). He also testified that Frank Nuhtayma and Ezra Hungeva had cattle which watered at a spring five miles west of Owl's Cap, and grazed south to Howell Mesa. 10 TT 1608, 1611 (Deposition of I. Naseyouma). Further, he testified that cattle belonging to Edwin Kaye, Jackson Tewa, Milo Tewa were near Wuukotutskwa (a long area extending south from the old Coal Mine, down the edge of the 1882 Reservation, to the southern edge of Moenkopi Plateau), out to Hootatsomi, 3–4 miles from Howell Mesa. 10 TT 1621–23 (Deposition of I. Naseyouma). He also testified that Kyarsyawma had a couple of corrals near his farm south of Paqlo, and grazed west to Masiskya and east of what is now Buck Pasture (near the old coal mine), 10 TT 1645–51 (Deposition of I. Naseyouma), and that cattle and horses, owned by a number of Hopis including Edwin Kaye, Jackson Tewa, Jackson Tuutsawina, Roger Honahni, and Nuutayma grazed at Hukvaqlo, 5–6 miles south of Kyarsyawma's farm. 10 TT 1651–52 (Deposition of I. Naseyouma). He further testified that various Hopis grazed stock during the winter west and east of Goldtooth. 10 TT 1653–54, 1657–58 (Deposition of I. Naseyouma). "Everyone's cattle and horses" grazed in area now called Buck Pasture. 10 TT 1660 (Deposition of I. Naseyouma). As Ira Naseyouma had an eye operation in 1934 that required him to spend several months in 1934 in the hospital and at home, 11 TT 1690–92 (Deposition of I. Naseyouma), his account of where livestock were grazed in 1934 may be overinclusive.

*See also,* 7 TT 1166–70 (Dr. Adams) (Site 104, sheep corral used by Gaseoma and Big Phillip outfit; Site 106, sheep corral used either by Siletstiwa or Fred Honahni; Site 132 (just north of Bakalo), two corrals used by Jackson Tewa); Ex. 719, pp. 12–13 (McCawley report) (southern Moenkopi Plateau part of "documented Hopi use area").

that Hopis grazed throughout Buck Pasture to Hukvahklo in 1934.[107] There is not sufficient evidence to conclude that Hopis *from the 1882 Reservation* were grazing on the southern Moenkopi Plateau.[108]

Navajos grazed on the southern Moenkopi Plateau as well, as is implicit in the Hopi Tribe's exclusion of areas south of Buck Pasture, such as Goldtooth, from its claimed exclusive area. The Court finds that Navajos did not graze north of the claimed Hopi exclusive area border.[109]

The Court finds that the central and southern Moenkopi Plateau to the border of the claimed Hopi exclusive area was exclusively used by Hopis in 1934; the area south of that border to Hukvahklo was jointly used in 1934.

### 5. *The Bakalo (or Hollow Place)*

There is evidence that Hopis grazed in the Bakalo,[110] and the Navajo Nation admits Hopis farmed in this area. Navajos also used the area for grazing.[111] The Court finds the Bakalo was jointly used.

**107.** In 1937, Gordon Page reported that the Moenkopi Hopi livestock range was confined north of the Buck Pasture fence. Ex. 451 at 2, *Moencopi Village Stock Operators and Range,* 4/15/37; and Ex. 493 at 36–37. However, the fence at Buck Pasture was built after 1934, and there was no barrier to Hopi livestock. Dr. McCawley reported that in 1937, the SCS foreman supervising the construction of the Buck Pasture fence removed 200 Hopi cattle from the area. Ex. 719, p. 13, 15 (McCawley report) (southern Moenkopi Plateau "almost certainly" used by Hopis).

Further, the Navajo Nation argues that the testimony of James Humetewa, Roger Honahni, and Ira Naseyouma that they grazed south of the Buck Pasture fence is inconsistent with the testimony of Hopi expert Dr. Adams, who admitted there were no physical remains or other archaeological evidence of any Hopi activity on the Moenkopi Plateau south of Owl's Cap. 8 TT 1197–98, 1225–27 (Dr. Adams). However, archeological evidence is not necessarily available regarding Hopi cattle and horse grazing.

The Navajo Nation also cites the testimony of Navajos who lived and grazed livestock on southern Moenkopi Plateau that they did not see Hopis or Hopi livestock in their grazing areas. 24 TT 3467–68 (Canyon) (no Hopis were herding around Goldtooth or "Pull the water out"); 25 TT 3561–63 (Keetso) (no Hopis grazing around Gold Spring); 28 TT 3919–20, 3923 (Nez) (no Hopis grazed at a place called "Windy Water"). This Court will accept Hopi testimony as it is supported by government documents.

**108.** The SCS investigations identified only one Third Mesa Hopi outfit grazing cattle outside LMU6 into LMU3 (Earl and Walter Albert and Simon Polingyamtiwa (aka Simon Seekayouma)), near well 178 west of Howell Mesa. (Ex. 480 at 1–2). However, part of LMU3 is inside the 1882 Reservation, and well 178 and Howell Mesa are inside the 1882 borders. Although Ira Naseyouma testified that some of Walter Albert's livestock grazed on the southern end of Moenkopi Plateau, some of the Plateau is within the 1882 border, and Naseyouma admitted that

the livestock tended to water near Howell Mesa. 11 TT 1671–72 (Deposition of I. Naseyouma).

**109.** Dr. Russell testified that Camp 273 occupied a hogan at Site 3–4 and a corral at Site 3–44 on the Moenkopi Plateau north of the Hollow Place in 1934. 23 TT 3327 (Dr. Russell). No hogan remains were found at Site 3–4, although Dr. Russell testified that any remains there may have been disturbed by recent squaw dances. 23 TT 3328 (Dr. Russell). Dr. Russell did not recall if other informants besides James Tsinnie had reported that Navajos lived in this area in 1934. 23 TT 3330 (Dr. Russell). The hogan at Site 3–4 was not visible in the aerial photographs. Finally, William Numkena testified that he did not see a hogan in this area in 1934. 30 TT 4197–98 (Numkena). The evidence indicates Site 3–4 was not used in 1934.

The corral at Site 3–44 was also designated as Adams' Hopi Site 132. 23 TT 3327 (Dr. Russell). Dr. Russell testified that he did not determine whether Hopis had used this site in 1934. 23 TT 3328 (Dr. Russell). Dr. Adams' interviews indicated that Jackson Tewa used the site in 1934. 7 TT 1170–71 (Dr. Adams); Ex. 651, App. I, Site 132 (Adams report). The Court finds that Site 3–44 was used by Hopis in 1934.

**110.** Ira Naseyouma testified that Frank Nuhtayma and Ezra Hungeva had cattle which grazed "out to Paqlo". 10 TT 1610 (Deposition of I. Naseyouma). As discussed previously, his account of where sheep were grazed in 1934 may be overstated.

*See also,* 7 TT 1171–73 (Dr. Adams) (Site 93, with remains of a dugout and two sheep corrals, and rock art with the names John and Russ (sons of Gaseoma), dated 11–18–34, used by Gaseoma and Big Phillip outfits; Site 88, stone house used by Milo Tewa); Ex. 651, App. I, Sites 88, 93 (Adams report).

**111.** Clark Keetso testified that he, Notooth, Herbert Zannie, Tillman Hadley, and Asdzaa Hoozhood grazed their animals into the Hollow Place. 25 TT 3541–42 (Keetso). This testimony was not contradicted by the Hopi Tribe.

### 6. The Little Bakalo

Although there was limited testimony that Hopis used this area in 1934,[112] the preponderance of the evidence shows that Hopis did not use this area for grazing until 1935.[113] Other evidence reflects that Navajos used this area for grazing in 1934.[114]

**112.** William Numkena testified that Hopi herders would use dugouts at Little Bahk–Lo (Hollow Place) when herding cattle to the south. 6 TT 976 (Numkena).

**113.** Roger Honahni testified he maintained a shelter in this area, but admitted it was not built until after a windmill was built there in 1934 or 1935. 3 TT 339 (Deposition of R. Honahni) (Adams Site 97). Dr. Adams admitted that there was no Hopi improvement in this area in 1934, and that Hopis attempted to move into this area only after a windmill was constructed by the government in 1935. 8 TT 1197–98, 1292 (Dr. Adams) (Sites 97, 130 probably built after 1935).

**114.** 25 TT 3541–42 (Clark Keetso); 18 TT 2621 (Dr. Russell).

**115.** Roger Honahni testified at deposition that in 1932, his cattle grazed at Coal Mine Mesa, 3 TT 345 (Deposition of R. Honahni). Other Hopis also had cattle in this area, including Jackson "T", Frank, Lewis, Earl and Sam Nutema, Polihongva, Seweyestewa, Koiyaheptewa, Tewangoitewa, Philip Pongyowyma, Burton, Edwin, Wilson, and Forrest Kaye, Henry, Robert, and Steven Dallas, James, Eric, and Alec Humetewa, Nasetoynewa, Logan Loma, Gaseoma, Siletstiwa, Milo Tewa, Wesley Seeguywa, Brian Gilbert, Edward Joneyestewa, Teddy Tomosie, George Nuvayestewa, Gashyesva, Billy Humetewa, Gilbert Quache, and his son Stanley Honahni. 3 TT 346–48 (Deposition of R. Honahni). He testified that cattle got water from Moenkopi Wash at Cow Tracks (the head of Coal Mine Canyon) at the bottom of the springs in Coal Mine Canyon, Dumahtep, and Porskwi. 3 TT 370, 373–74, 377–78, 384–85, 387–88 (Deposition of R. Honahni). Further, the Pongyowyma brothers (Hopi) had sheep and a rock house at Tsorspatuikavehk. 3 TT 381–82.

Ira Naseyouma testified his father's cattle grazed east to Tsorspatuyqa, east of the sand dunes, southeast of Posiwlelena. 10 TT 1606 (Deposition of I. Naseyouma). He also testified that George Nuvayestiwa and Nasitoyniwa grazed around the sand dunes and west of the old Coal Mine, and that Milo Tewa, Wilson Kaye, Ezra Hungeva, Herman Honyamtiwa, Willie and Louis Numkena, and Ray Nasitoyniwa grazed west of the sand dunes, south of the coal mine around Ankinamuru. 10 TT 1615–17

### 7. Coal Mine Mesa

The Hopi Tribe introduced substantial evidence that Hopi livestock grazed in the Coal Mine Mesa area in 1934.[115] The Navajo Nation argues that Hopis were confined to the southwestern portion of Coal Mine Mesa,[116] but the evidence shows that Hopis grazed in other areas as well, including "around the sand dunes" at Nanmuru.

(Deposition of I. Naseyouma). Naseyouma also testified that after Kyarsyawma separated from his father in the early thirty's (1932–36), he moved toward the sand dunes toward Coal Mine at Tepsotsmo (or Pipkyaqlo). 10 TT 1635 (Deposition of I. Naseyouma). Kyarsyawma also had a sheep corral 2 miles north of Tsorspatuyqa, which he used *before* he separated with father. 10 TT 1643 (Deposition of I. Naseyouma). As discussed earlier, his account of where sheep were grazed may be overstated.

*See also*, 4 TT 540–46 (Dr. Godfrey) (Hopis, including the Dallas group, Jackson Tewa, James Humetewa, Roger Honahni, Edward Kaye, Lewis and Earl Numkena, and Frank Nuhtayma grazed cattle on Coal Mine Mesa, and Gaseoma, Teddy Honyanpewa, Nasioma, "Big Phillip", Logan Loma, Ernest Holmes, and Charlie Talawipi grazed sheep on Coal Mine Mesa); 7 TT 1173–79 (Dr. Adams) (Site 85, water catchment used to water Hopi sheep; Site 87, corral and circular stone structure used by Big Phillip; Site 86 was occupied by Navajos in 1934); Ex. 719, pp. 10–12 (McCawley report) (Coal Mine Mesa "documented Hopi use area").

**116.** The SCS Human Dependency Schedules shows that certain Hopis grazed in the southwest portion of Coal Mine Mesa. Ex. 16, (Sam Numkena, 3 mile S.W. of Coal, all year); Ex. 17 (Ray Nasitoyniwa and Bryan Gilbert, 4 mile W of Coal Mine, all year); Ex. 18 (Ernest K. Moore, 4 mile W and SW of Coal Mine, winter, 4 mile W Coal Mine summer); Ex. 19 (Frank Nuhtayma, vicinity of Coal Mine, all year); Ex. 21 (Roger Honahni, W of Coal Mine all year); Ex. 22 (John Talashoyiwma, vicinity of Coal Mine, all year). However, these Hopis would have grazed throughout the vicinity of the locations noted: it would not be possible for an outfit's livestock to graze at "4 mile W of Coal Mine" all year; further, Nuhtayma and Talashoyiwma are listed as living "in the vicinity of Coal Mine", a broad area.

While Dr. Adams admitted that the sites identified on the northeastern part of Coal Mine Mesa (referred to a "Nanmuru") were sites at which Hopis unsuccessfully attempted dry farming, and were abandoned not later than the 1920's, 8 TT 1248 (Dr. Adams), this did not preclude Hopi grazing in the area.

It is also clear from the evidence that Navajos grazed livestock in the Coal Mine Mesa area.[117] Dr. Russell's investigation revealed a number of Navajo Camps in this area. The Court finds Camps 123 [118] and 125 [119] grazed in this area, and that Camps 41 [120] and 60 [121] did not. The Court finds that Coal Mine Mesa was jointly used.

**117.** Ex. 2676, a report dated April 16, 1937 by D.G. Anderson, Junior Range Examiner, states, "The present range use by the Hopis is Coal Mine Mesa, around the Moencopi Village, and Ward Terrace. This range is also used by Navajos."

**118.** *Camp 123:* Dr. Russell testified that George and Mary Bancroft, Richard and Helen Tsinnie, and children of both families had two winter sites: the first, at which there were two hogans and several corrals (Site 3–1), was 4 miles northwest of the Coal Mine. Site 3–33, about 3 miles north of site 3–1, has few remains because a son, born in 1934, died in that hogan in 1938 or 1939, which was subsequently burned. The family used the northern end of Coal Mine Mesa in the area of these sites for herding. 18 TT 2604–2617 (Dr. Russell). The January, 1935 letter listed George Bancroft living northeast of the Old Coal Mine Road. Ex. 2554 at 3.

The Hopi Tribe argues that Site 3–1, also designated as Adams' Site 86, was occupied by the Bancrofts only after the Hopis who occupied the site re-located to Adams Site 87. See 7 TT 1173–75 (Adams); Ex. 651, App. I, Site 86. However, there is no evidence that the Hopis using this site relocated after 1934. Dr. Adams states that Site 86 was in use from the 1920's into the 1930's "circa 1934", and that the site was used only occasionally by the mid–1930's. 7 TT 1175 (Dr. Adams). Dr. Adams testified that the hogan and corrals were visible in the aerial photographs. 7 TT 1174 (Dr. Adams).

The Hopi Tribe further claims that Helen Tsinnie, a member of the Camp in 1934, never resided at Site 3–1 in 1934. In the winter of 1933, she lived with the Bancrofts at Site 3–2, and at two hogans farther east. From that site, she herded to the rim of Coal Mine Mesa, but not onto the mesa. In June 1934, after the birth of her daughter she resided with the Bancrofts at Site 3–79. In early 1935, Helen Tsinnie moved to Tuba City, and thereafter visited the Bancrofts at Site 3–1. 25 TT 3578–3595 (Tsinnie). However, when asked, "Did the Bancrofts have other homes that they used at the time that you came to live with them?", Tsinnie mentioned several hogans, including one on Coal Mine and hogan on Coal Mine Mesa. 25 TT 3585, 3589 (Tsinnie). Further, she testified that Mattie Bancroft, Mary's daughter, lived at the Coal Mine hogan right after Angela was born, in 1934. 25 TT 3593 (Tsinnie).

Dr. Russell was shown the site by the son-in-law of Mary Bancroft, and later by Richard and Helen Tsinnie, who were members of the camp in 1934. Dr. Russell stated that several other informants confirmed this information, and the structures were typically Navajo. 18 TT 2609 (Dr. Russell).

area. The Court finds Camps 123 [118] and 125 [119] grazed in this area, and that Camps 41 [120] and 60 [121] did not. The Court finds that Coal Mine Mesa was jointly used.

The Hopi Tribe also argues that William Numkena testified that although he regularly helped his uncles farm in the vicinity of Site 3–1, he did not see a hogan in that area until after he returned home from Phoenix Indian School in 1936. See 30 TT 4200–01 (Numkena). However, the testimony regarding where his uncles farmed was not specific enough to tell if Numkena would have seen the hogan.

The Court finds that the Bancroft camp was located in this area in 1934.

**119.** *Camp 125:* Dr. Russell testified that Henry Billy herded his sheep on the Coal Mine Mesa during the summer in 1934. 18 TT 2619–22 (Dr. Russell).

The Hopi Tribe argues that his use of northern Moenkopi Plateau and Coal Mine Mesa was limited to short periods when water sources failed in his customary use area to the south. 30 TT 4183 (Billy). However, it appears that much of summer of 1934 was spent in this area, and the Court finds that Henry Billy was located in this area.

**120.** *Camp 41:* Dr. Russell testified that Jake Saganitso and his family resided in the area of Greasewood Lake, and farmed in Kerley Valley. The family used Coal Mine Mesa as a winter residence both before and after 1934 (though they did not live there in 1934), and as a grazing area in 1934. 17 TT 2561–63 (Russell). A government letter dated January, 1935, lists three Navajo families living northeast of the Old Coal Mine Road: George Bancroft, Adolph Maloney, and Sagenetso [Saganitso]. Ex. 2554 at 3.

The Hopi Tribe argues that there is no evidence that this Camp used that part of Coal Mine Mesa inside the exclusive use area in 1934. Dr. Russell did not identify a specific site, and Victor Saganitso testified at trial about two residences "east of Coal Mine", which the Hopi Tribe argues are probably outside the exclusive area. 24 TT 3493–94 (Dr. Russell). Further, the Hopi Tribe argues that Saganitso was not able to testify what happened in 1934, because he testified that the goat reduction, the primary event Dr. Russell used to orient his informants, occurred between 1938 and 1946. 24 TT 3489–90 (Saganitso).

The Court finds that Camp 41 did not live or graze within the Hopi claimed exclusive area in 1934.

**121.** *Camp 60:* Dr. Russell testified that Camp 60 consisted of several families, including Adolph Maloney, a Vice–Chairman of the Navajo Tribe in the 1950's, and his mother Belle Maloney. In 1934, Adolf Maloney and his immediate family resided in Tuba City. Belle Maloney resided north of the Coal Mine at Site 3–46 (outside of the exclusive use area), and at Site 3–47 on Coal Mine Mesa, for which there are no remains. From Site 3–47, the family would herd on Coal

## 8. *Moenkopi Wash/Kerley Valley*

The preponderance of the evidence supports a finding that both Hopis and Navajos grazed in the Moenkopi Wash/Kerley Valley area, east of the Village of Moenkopi. There was testimony that Hopis primarily grazed southeast and east of the Village,[122] and that Navajos primarily grazed east and northeast of the Village [123] from the Standing Big Tree area (Camps 44,[124] 173,[125] and 242 [126]).

## 9. *North of Moenkopi Wash*

The Hopi Tribe introduced limited testimony that Hopis grazed their livestock north of Moenkopi Wash, including around

Mine Mesa and into Hollow Place. 18 TT 2581–84 (Russell). A government letter dated January, 1935, lists three Navajo families living northeast of the Old Coal Mine Road: George Bancroft, Adolph Maloney, and Sagenetso [Saganitso]. Ex. 2554 at 3.

The Hopi Tribe argues that there is insufficient evidence that Camp 60 resided or grazed on Coal Mine Mesa in 1934. First, Dr. Russell testified that Camp 60 lived on Coal Mine Mesa for about five years in the 1930's, then returned to its customary use area around Red Lake (20 miles northeast of Moenkopi). 22 TT 3197–3201. Further, Adolph Maloney testified at deposition in 1983 that his family resided, farmed, and grazed their livestock near Red Lake in 1934, and that while driving across Coal Mine Mesa in 1934, he saw some Navajos living near Coal Mine Canyon, but did not know who they were. 30 TT 4143–59 (Maloney). Although the Hopi Tribe acknowledges that Camp 60 lived on Coal Mine Mesa at some time prior to 1935 due to the government letter cited above, it argues, "the occupation was plainly not of sufficient duration or importance to have impressed itself upon Mr. Maloney's memory." (Navajo response at 56). Further, the area northeast of the old Coal Mine Road, includes land within and outside of the exclusive use area.

The Court finds that the Adolph Maloney family did not live and graze within this area in 1934.

**122.** Roger Nasevaema testified at trial that he helped Naseyawma herd about 80 sheep, in a southeasterly direction from the Village on the far side of Moenkopi Wash. 2 TT 275 (Nasevaema).

Ira Naseyouma testified at deposition that his father and Siletstiwa had a sheep corral on the south side of the Village and the wash, and a second sheep corral in 1934 at Moenkopi bridge. 10 TT 1592 (Deposition of I. Naseyouma). Pongyangoytiwa (Palmer) kept his sheep at a corral just west of the first corral. 10 TT 1590–92 (Deposition of I. Naseyouma). Although Ira Naseyouma had an eye operation in 1934 that required him to spend several months in the hospital and at home, 11 TT 1690–92 (Deposition of I. Naseyouma), his account of grazing *near* Moenkopi is credible.

Guy Naseyouma testified at deposition that he had a horse corral in the village, and that these horses would graze in the taatoq (southeast)

direction from the village. 11 TT 1808 (Deposition of G. Naseyouma).

*See also*, 7 TT 1154–1165, 1179–80 (Dr. Adams) (Site 157, 115, 116, 117, 118, 108, 109, 110, 111, 112, 114, and 124 Hopi sheep corrals used by the "Big Phillip" outfit; Site 82, sheep corral used by Palmer Accowsie; Site 113 used by Gaseoma; Site 130 used by Jackson Tewa (not depicted on Hopi Ex. 703A); Sites 90, 120, 139, community corrals).

**123.** Although Dr. Adams concluded that several rock sheep corrals along the southern wall of Moenkopi Wash east of the Village must have been Hopi enclosures, Adams admitted that rock construction "in and of itself would not rule out use by Navajos" 7 TT 1100–01 (Dr. Adams), and Navajo hogan remains are found in that area, one of which is next to a stone corral. 7 TT at 1154–55, 1276–78 (Dr. Adams).

**124.** *Camp 44:* Jake Bracker and his family had primary summer residence and field at Site 3–72, at Standing Big Tree. The family herded in all directions, north and south of Moenkopi Wash. 17 TT 2564–65. The Camp was related to Camp 173, and the Hopi Tribe's arguments are addressed with regard to Camp 173.

**125.** *Camp 173:* Dr. Russell testified that Joe Notooth and his family had two primary farming areas. One was at Standing Big Tree, residence site 3–70 and a field about a quarter mile from the residence; the line of the Hopi proposed "exclusive use area" goes through this field. The family also had a corral, site 3–71 associated with the residence site. 18 TT 2648 (Dr. Russell). Although the LMU3 Range Management Report, Ex. 3175, places Joe Notooth at "Greasewood Valley", the Hopi Tribe admitted that Notooth's primary residence and grazing area was in Standing Big Tree and that Camp 173 would have passed through the exclusive area in its travel between Standing Big Tree and the southern Moenkopi Plateau.

**126.** *Camp 242:* Lee Phoenix and his family had a summertime residence and corral at Site 3–71 and 3–74, at Standing Big Tree. Although no members of this Camp were living who resided there in 1934, or were too young in 1934 to provide reliable evidence, Dr. Russell opined that this Camp grazed on both the north and south sides of the Moenkopi Wash. 18 TT 2691–93 (Dr. Russell). The Hopi Tribe did not chal-

Red Lake, Middle Mesa, and Wildcat Peak.[127] However, no government document of the period mentions Hopi grazing in this area,[128] and Navajo testimony showed there was little, if any, Hopi grazing here.[129] The Court finds that Hopis did not graze their livestock north of Moenkopi Wash (except in Pasture Canyon, as previously discussed).

## IV. *Other Hopi Uses*

The Hopi Tribe also claims an interest in the 1934 Reservation based on the location of traditional Hopi activities, such as eagle gathering, visiting shrines, gathering ceremonial plants, ceremonial hunting, gathering edible plants and pinon nuts, gathering medicines, collecting plant materials for tools and crafts, gathering fuelwood and construction wood, subsistence hunting, and mineral gathering.

### Religious activities

■ The Hopi Tribe explains that for centuries, the gathering of live young eagles has been a fundamental aspect of Hopi religious life. Eagle gathering is conducted annually in the spring. Preliminary trips to check on the eagle nests are made; eaglets are then gathered live when they are at the appropriate age. Offerings are made at eagle shrines within the gathering areas, and the eaglets are transported back to the Hopi villages where they are cared for as members of the clan of the eagle gatherers until midsummer when they are

lenge the location or suggested grazing area of this Camp.

127. Roger Honahni testified that he and Lahongva, Kuwanhaptewa, and Milo Tewa ran stock in the area from Moenkopi Village east to the Middle Mesa area. 3 TT 358, 367 (Deposition of Roger Honahni). Honahni testified that Gaseoma, Siletstiwa, Wesley Seguiva, Teddy Tomosie, Talesmaenewa, Naseyouma, Phillip Pongyowyma and his children, and Logan Loma grazed sheep beyond Moenkopi Canyon (Moenkopi Wash) to the north. 3 TT 401 (Deposition of R. Honahni). Pongyagoitewa, Seweyumptewa, Danakhoinewa, Naseyowma, Lomaquaptewa, Kelhongnewa, Sewiltima, Natwantewa herded their sheep up to Red Lake, Middle Mesa, and Pasture Canyon. 3 TT 402–05 (Deposition of R. Honahni). Further, Honahni testified that horses would graze up to the west side of Middle Mesa. 3 TT 308 (Deposition of R. Honahni).

Ira Naseyouma testified that his father had a number of sheep corrals: one was on the old road to Oraibi (which he didn't use much), about five miles east of where the present rest area is located. 10 TT 1598–99 (Deposition of I. Naseyouma). Ira Naseyouma also testified his father and Kyarsyawma's father had winter sheep corrals north of Tuba City, west of Tutukwiwya, and would graze west to Moenave, south to Highway 89, north to Yuvuqpu, and east to Tepqolo (south of Pikyáingwtsomo, or Wildcat Peak). The men also had winter sheep corrals by Wildcat Peak, and would graze southeast to Red Lake, west to Pasture Canyon, but would not graze north far. 10 TT 1593–98, 1679–87 (Deposition of I. Naseyouma). Guy Naseyouma testified that Kyarsyawma corraled his sheep between Pasture Canyon and the village, 11 TT 1833 (Deposition of G. Naseyouma), inconsistent with Ira Naseyouma's testimony. Further, as noted previously, Ira Naseyouma had an eye operation in 1934 that required him to spend several months in the hospital and at

home, 11 TT 1690–92 (Deposition of I. Naseyouma), lending his account of where sheep were grazed in 1934 implausible. Further, Ira Naseyouma's testimony that he herded his father's sheep from Pasture Canyon to Wildcat Peak is contradicted by his brother, Guy Naseyouma, who testified that his father's sheep were not grazed in the Pasture Canyon area until after 1937, and did not mention grazing his father's sheep in the Wildcat Peak area. Guy Naseyouma's testimony was corroborated by Roger Nasevaema, who lived with Ira and Guy's father, Naseyawma, in 1936, who testified that he grazed the sheep southeast from the village on the far side of the wash. 2 TT 263–64 (Nasevaema).

*See also,* 10 TT 1520 (Dr. McCawley) (Preston Mesa, Middle Mesa was "maximum likelihood Hopi use area" based on forage and water availability).

128. The LMU1 Range Management Report, Ex. 3098 at 46–47, did not mention Hopi livestock owners.

129. Keith Lane, a Navajo who grazed livestock in the Wildcat Peak area in the 1930's, testified that he did not see any Hopis grazing livestock around Wildcat Peak, Gopher Springs, or Middle Mesa in the 1930's. 26 TT 3705–06 (Lane). Richard Butler, who lived and grazed livestock north and northeast of Pasture Canyon during the 1930's, testified that he did not see any Hopi livestock in that area, including at Preston or Red Mesa, Dogwater or Dog Springs, White Point, Echo Cliffs, or north of Tuba City. 25 TT 3618–19, 3627–28 (Butler). Victor Saganitso, who lived and raised livestock in the Greasewood area during the 1930's testified that he did not see any Hopis in that area. 24 TT 3491–93 (Saganitso). Percy John also testified at deposition that he did not see any Hopis grazing livestock north of Tuba City, around Pasture

sacrificed. The eagle gathering areas are divided among Hopi clans, generally on the basis of the route taken by the group during its migration to the Hopi mesas. Expert and lay testimony and historical documents were introduced regarding the practice of eagle gathering and the areas in which eagles were gathered.[130]

The Hopi Tribe also claims rights to the 1934 Reservation based on the existence of religious shrines and sacred places throughout the Reservation.[131] These shrines are particular locations visited in connection with religious ritual, and are generally marked by rock cairns, petroglyphs, or hidden depositories for offerings. Religious leaders make pilgrimages seasonally, annually, or periodically in connection with certain events. There were substantial expert and lay testimony and historical documents introduced demonstrating the importance of these shrines to the Hopi people and the location of some of these shrines.[132]

Further, Hopis gathered plant materials, such as fir boughs and wild tobacco, for use in annual ceremonies. The plants gathered, their locations, and the journeys to gather the plants have religious significance.[133]

Hopis also hunted rabbits, foxes, coyotes, and deer for ceremonial purposes.[134]

25 U.S.C. § 640d–20 guarantees the use and right of access to Hopi religious shrines if they are located on the Navajo reservation after partition. That section states:

> Notwithstanding anything contained in this subchapter to the contrary, the Secretary shall make reasonable provision for the use of and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access are for religious purposes.

Given that access to religious shrines will be protected, the Hopi Tribe cannot persuasively argue that their presence gives the Hopi Tribe a property interest as such in the 1934 Reservation.[135]

Further, this Court has previously held that religious interests in land held in trust for another Indian Tribe do not create a property interest in that land. In *Manybeads v. United States*, 730 F.Supp. 1515 (D.Ariz.1989) (appeal pending), this Court held that individual Navajos did not have a First Amendment right to remain on property held in trust by the United States for the Hopi Tribe. This holding was dictated

---

Canyon or at Greasewood Lake. 26 TT 3756 (Deposition of P. John).

**130.** 1 TT 102–18, 124–27 (Peter M. Whiteley); Ex. 659, p. 69–74 (Whiteley report); 12 TT 1895–1904 (Allan D. Ainsworth); Ex. 655, 76–84, 95 (Ainsworth report); 2 TT 226–31 (Joshevaema); 2 TT 246–56 (Lomayaktewa); 2 TT 265–75 (Nasevaema); 6 TT 862–64 (Hamana); 6 TT 1010–13 (Humetewa); Ex. 736, p. 373–85 (deposition of Ira Naseyouma); Ex. 115, H.R.Voth, "Notes on the Eagle Cult of the Hopi" (1912); Ex. 404, Earnest Beaglehole, "Hopi Hunting and Hunting Ritual" (1936). Ex. 714, Att. 3, depicts these eagle gathering areas.

**131.** Many of these places have religious significance to the Navajos as well.

**132.** 1 TT 71–87, 111–13, 121–124 (Peter M. Whiteley); Ex. 659, p. 1–39, 58–74 (Whiteley report); Ex. 715, Map 2 (Map binder accompanying Whiteley report); 8 TT 1202–08 (Adams); Ex. 651, p. 99–102, App. I Sites 84, 107, 147, 154, 155 (Adams report); Ex. 655, p. 76–84, 95 (Ainsworth report); 2 TT 217–31 (Joshevaema); 2 TT 252–54 (Lomayaktewa); 2 TT 274 (Nasevaema); 3 TT 405, 411–13 (Honahni); 6 TT 884–913

(Hamana); 6 TT 935–36 (Numkena); 12 TT 1904–06 (Ainsworth); Ex. 310 (Letter from Colton to Scattergood, 6/10/32); Ex. 345 (Letter from Edgar K. Miller to CIA, 6/28/33). The approximate location of many shrines within the 1934 Reservation are depicted on Ex. 715, Map 2.

**133.** 1 TT 109–11 (Whiteley); 3 TT 413–20 (Roger Honahni); 6 TT 941–42 (Numkena); 6 TT 1006–09 (Humetewa); 12 TT 1904–06 (Ainsworth); Ex. 655, p. 32–35, 95, App. 3, Table 6 (Ainsworth report); Ex. 659, p. 58–68, 75–83 (Whiteley report). The areas in which plants were gathered are depicted in Ex. 704, Att 4.

**134.** 1 TT 109–11 (Whiteley); 3 TT 437–43 (Roger Honahni); 6 TT 1014–16 (Humetewa); 12 TT 1906–08 (Ainsworth); Ex. 655, p. 65–73, 94, App. 3, Table 16 (Ainsworth report); Ex. 659, p. 58–68, 75–83 (Whiteley report). Areas used by Hopis in 1934 for ceremonial hunting are depicted on Ex. 704, Att. 5.

**135.** Eagle gathering areas arguably qualify as religious related sites for access by Hopi clan members. In this regard, the Court expresses

by the opinion in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), in which the Supreme Court had held that, in essence, "[t]he nature of the religious rights claimed cannot create a de facto beneficial ownership of public (or private) property, in order to practice ones religion." *Manybeads v. United States*, 730 F.Supp. at 1517; *see also, Attakai v. United States*, 746 F.Supp. 1395 (D.Ariz.1990).

■ The Hopi Tribe does not contend that it derives an interest in the 1934 Reservation due to the First Amendment rights or religious interests *per se*. Instead, the property interest claimed by the Hopi Tribe results from the "occupation, use and possession" for religious purposes of Hopi Indians on the 1934 Reservation. However, a holding that *religious* use is sufficient to create a property interest for the Hopi Tribe (and thus divest the Navajo Nation of its "residual" property interest in the 1934 Reservation) would directly contradict *Lyng*. Thus, the Hopi Tribe claims in the 1934 Reservation based on the eagle gathering activities, visiting shrines, and gathering of ceremonial plants and animals are not sufficient "occupation, use and possession" to establish a property interest for exclusive use or partition purposes.

Further, the Hopi Tribe has not demonstrated that these activities were of the intensive nature necessary to create a property interest under the Act. Eagle gathering occurred only once a year, with only a small number of men involved.[136] The Hopi Tribe failed to demonstrate that a substantial number of Hopis travelled to shrines outside of the immediate vicinity of the Hopi villages in the 1930's,[137] and many of the shrines are often only known to a small number of Hopis.[138]

Moreover, the evidence presented at trial reflects that ceremonial plant gathering was sporadic and at irregular intervals,[139] and that most gathering occurred around the vicinity Moenkopi, off-reservation at San Francisco Peaks, or inside the 1882 Reservation.[140]

Ceremonial hunting was also not of the intensive nature necessary to create a property interest. By 1930, Moenkopi Hopis were no longer hunting foxes and coyotes,[141] and deer were almost extinct in LMU3.[142]

### Non-religious activities

■ Hopis gathered various edible plants to add to their diet in 1934, including greens, herbs, vegetables, fruits, seeds and berries. A number of witnesses testified regarding where plants were gathered.[143] However, Hopi plant gathering outside the immediate vicinity of Moenkopi was not

no opinion respecting any regulations concerning capture of eaglets by either Tribe.

**136.** Ex. 721 at 101–02; 255 (Deposition of Starlie Lomayaktewa) (eagles gathered only once a year; six men usually involved); 2 TT 230 (Josheveama) (same); 3 TT 460–61 (Deposition of R. Honahni) (two to three men involved); 1 TT 161–62 (Dr. Whiteley) (six or seven people involved). Further, the eagle-gathering trips would last only one to three days. 3 TT 461 (Deposition of R. Honahni) (would come back the same day if not too far).

**137.** 1 TT 166 (Dr. Whiteley) (not aware of any pilgrimages made of the Tutskwa boundaries before the 1970's).

**138.** 1 TT 154 (Dr. Whiteley) (conceding).

**139.** 6 TT 980–81 (Numkena) (it took about six hours to get fir boughs in the San Francisco Peaks; women gathered yucca in the spring,

which only took a couple of hours; ceremonial materials were gathered once a year).

**140.** Pine, cedar, spruce, and materials for kachina costumes were gathered at San Francisco Peaks. 6 TT 941, 980 (Numkena); Ex. 732 at 113–15 (Deposition of J. Humetewa); 3 TT 417 (Deposition of R. Honahni). Yucca was gathered within three miles south of the Village of Moenkopi. 6 TT 942 (Numkena). Tobacco was found inside the 1882 Reservation. 3 TT 414 (Deposition of R. Honahni).

**141.** 3 TT 442–43 (Deposition of R. Honahni)

**142.** 13 TT 2014 (Dr. Ainsworth) (agreed that few, if any, deer on the 1934 Reservation by 1900).

**143.** 3 TT 416–17 (Deposition of R. Honahni); 6 TT 1031–33 (Deposition of J. Humetewa); 11 TT 1752–57 (Deposition of R. Lomayesva); 12 TT 1835–38 (Deposition of G. Naseyouma); 12 TT 1913–16 (Dr. Ainsworth); Ex. 655, p. 12–22, 89–90, App. 3, Table 1 (Ainsworth report). The

sufficiently intensive to give rise to a property interest: the evidence shows that most of the plant gathering took place close to Moenkopi and that gathering outside of this area was irregular and often depended on where a person was traveling.[144]

Also, Hopis gathered pinon nuts annually to supplement their diet.[145] However, the gathering of pinon nuts is not sufficient to create a property interest: they were generally gathered only once a year, and because pinons ripen in an area only once every five to seven years, Hopis went to different places every year. Further, Dr. Ainsworth admitted that pinon nuts were rarely found and "unusual" in the Hopi diet.[146]

The Hopi Tribe also contends that Hopis gathered medicinal plants circa 1934.[147] Again, this practice is not sufficient to create a property interest in the area.

The Hopis also collected materials for tools and crafts, including reeds, grasses, and yucca to make baskets, plaques, and bridal "suitcases". Weaving tools, hunting sticks, and bows and arrows were made from oak, mountain mahogany, ironwood, and greasewood, and kachina (or "katsina") figures and other ritual objects were made from cottonwood roots.[148] Again, the evidence demonstrates that this use was not sufficiently intensive to create a property interest. Bows and arrows were no longer used for hunting in 1934, but for gifts, and some tourist trade.[149] Yucca was only gathered in the spring, generally within 3 miles of Moenkopi,[150] and cottonwood was generally "fished" out of streams after storms, rather than cut down.[151]

The Hopis also gathered firewood for cooking and heating at great distances from their villages, since firewood had become scarce within the Reservation by 1934.[152] However, it appears from the evidence that wood gathering inside the 1934 Reservation was waning in 1934, and that most took place in the 1882 Reservation.[153] Further, Hopis often used alternative forms of fuel, such as brush, greasewood, and corncobs from Hopi fields.[154]

The Hopis also gathered construction wood to build their homes, kivas, and corrals.[155] Again, the evidence shows that most wood was not obtained on the 1934 Reservation due to the severe depletion,

areas in which Hopis gathered edible plants are depicted on Ex. 704, Att. 8.

144. 6 TT 1031–33 and Ex. 732 at 105, 111, 119, 120–21 (Deposition of J. Humetewa) (gathered duitsma [an herb] around Moenkopi; gathered quiva along Moenkopi Wash; gathered spinach along the Moenkopi Wash farming area; wild tea, south of Moenkopi at Hollow Place [the Bakalo]); Ex. 736 at 812–22 (Deposition of I. Naseyouma) (did not gather wild plants every year); 3 TT 416–17 (Deposition of R. Honahni) (collected greens if happened to be out on the range: "We don't go any particular direction or place to gather this").

145. 6 TT 1013 (Deposition of J. Humetewa); 12 TT 1916–18 (Dr. Ainsworth); Ex. 655, p. 22–23, 90, App. 3, Table 2 (Ainsworth report). The areas where pinon nuts were gathered in 1934 are depicted on Ex. 704, Att. 9.

146. 12 TT 1916–17 (Dr. Ainsworth).

147. 3 TT 417–418 (Deposition of R. Honahni); 12 TT 1918–20 (Dr. Ainsworth); Ex. 655, p. 31–32, 91, App. 3, Table 5 (Ainsworth report). The area in which medicinal plants were gathered is depicted on Ex. 704, Att. 12.

148. 3 TT 416 (Deposition of R. Honahni); 11 TT 1757–60 (Deposition of R. Lomayesva); 12 TT 1924–34 (Dr. Ainsworth); Ex. 655, p. 23–31, 35–37, 90–92, App. 3, Tables 3, 4, 7, 8, 9 (Ainsworth report). The areas in which these materials were gathered are depicted on Ex. 704, Att. 10, 11, 17, 18, and 19.

149. 12 TT 1933–34 (Dr. Ainsworth).

150. 6 TT 941–42, 981 (Numkena).

151. 12 TT 1928–29 (Dr. Ainsworth).

152. 3 TT 315–20 (Deposition of R. Honahni); 6 TT 1002–05 (Deposition of J. Humetewa); 13 TT 2067 (Deposition of A. Honahni); 12 TT 1927, 34–36 (Dr. Ainsworth); Ex. 655, p. 29–31, 37–43, 92–93, App. 3, Table 10 (Ainsworth report). Ex. 704, Att. 14 depicts wooded areas where Hopis gathered firewood.

153. 7 TT 1049–51 (Deposition of J. Humetewa) (stopped getting wood at Gap and Wildcat by 1936 and went instead to the 1882 Reservation); 3 TT 317–19 (Deposition of R. Honahni) (gathered fuelwood at Black Mount in 1882 Reservation).

154. 12 TT 1937 (Dr. Ainsworth).

155. 3 TT 312–15 (Deposition of R. Honahni); 12 TT 1937–38 (Dr. Ainsworth); Ex. 655, p. 43–44, 93, App. 3, Table 11 (Ainsworth report). The

but in the Flagstaff/San Francisco Peaks area.[156] The limited wood gathering that occurred is not sufficient to create a property interest in the 1934 Reservation.

The Hopis also hunted small game for subsistence, including rabbits, squirrels, prairie dogs, and quail.[157] Evidence indicates, however, that by 1934, rabbits were the only wild game hunted by the Hopis, and many rabbits were found in the Moenkopi vicinity.[158]

Finally, the Hopi Tribe also claims that Hopis gathered mineral resources, such as stone, coal, clay, and pigments for construction, fuel, tools, and religious uses.[159] However, the Hopi Tribe did not demonstrate that Hopis went out of the Moenkopi area to gather such materials with any regularity.[160]

Dr. Ainsworth admitted on cross-examination that he did not intend that *all* of the area indicated on his maps were used by Hopis for these purposes; the maps do not indicate specific areas of use, but only broad general areas representing use.[161] Dr. Ainsworth's testimony is therefore not sufficient to establish how intensive any of the above uses were in 1934, and the Hopi Tribe may not assert rights and interest in the 1934 Reservation on that basis.

## CONCLUSIONS OF LAW

This Court has jurisdiction pursuant to the Navajo–Hopi Settlement Act, 25 U.S.C.

§ 640d–7, 88 Stat. 1715 (1974), as amended, 94 Stat. 929 (1980).

The Act of June 14, 1934, 48 Stat. 960 (1934) (the "1934 Act"), conveyed an equitable interest in certain of these lands to the Navajo Nation and "such other Indians as may already be located thereon", including the Hopi Indians.[162]

Certain lands within the boundaries of the 1934 Reservation are excluded from litigation and thus not subject to the claims of the Hopi Tribe, including the 1882 Reservation, certain lands previously reserved by Congress for water power purposes and power sites, lands reserved by the 1868 Treaty with the Navajo Nation, 15 Stat. 667, lands withdrawn by the Act of May 23, 1930, 46 Stat. 378, lands withdrawn by the Act of February 21, 1931, 46 Stat. 1204, allotted lands for which patents issued, lands purchased on behalf of the Navajo Nation, privately owned lands relinquished pursuant to Section 2 of the 1934 Act, and lands conveyed to the State of Arizona for the "support of the common schools" which were surveyed prior to withdrawal of the land pursuant to Executive Order. The location of these "excluded" lands has not been established; in Phase II of this litigation regarding partition, the parties will have the opportunity to present evidence regarding the location of these lands.

areas in which wood was gathered is depicted on Ex. 704, Att. 16.

**156.** Ex. 3176 at 47–48 (LMU3 Woodland Survey Report) ("accessible wooded areas have been severely cut and depleted); 3 TT 313, 446 (Deposition of R. Honahni).

**157.** 3 TT 437–41 (Deposition of R. Honahni); 6 TT 1014–16 (Deposition of J. Humetewa); 13 TT 2048–49 (Deposition of A. Honahni); 12 TT 1920–24 (Dr. Ainsworth); Ex. 655, p. 65–73, 94–95, App. 3, Table 17 (Ainsworth report). The hunting area is depicted on Ex. 704, Att. 13.

**158.** 3 TT 437–38, 443 (Deposition of R. Honahni); 6 TT 1014–16 (Deposition of J. Humetewa).

**159.** 3 TT 312–13, 420–23, 443–46 (Deposition of R. Honahni); 6 TT 942–43, 978 (Numkena); 6 TT 1009–10, 1020–22 (Deposition of J. Humetewa); 8 TT 1198–1201 (Dr. Adams); Ex. 651, p. 102–03. App. 1 (Adams report); 12 TT 1937–40 (Dr. Ainsworth); Ex. 655, p. 74–75, 85–86, 96,

App. 3, Table 18, 19, 21 (Ainsworth report). The areas are depicted on Ex. 704, Att. 15.

**160.** "Duma", or white clay, was gathered for ceremonial purposes only once a year. 6 TT 981 (Numkena). Stone was quarried very near the Village of Moenkopi. 3 TT 313, 422–23 (Deposition of R. Honahni). Other materials were gathered in the 1882 Reservation, 6 TT 943 (Numkena) (gathered "tuuma" in the 1882 Reservation); and coal was often purchased from local traders. 3 TT 459 (Deposition of R. Honahni).

**161.** 12 TT 1892 (Dr. Ainsworth) ("people talk generally about areas. They would give a place name and say that general area"); ("Their representations were general use patterns, based on the best of my ability to place the areas on the map"). *See also* 13 TT 2016–17 (Dr. Ainsworth).

**162.** "Such other Indians" also include the Paiute Tribe, for which the Court will issue separate findings and conclusions.

All other lands, including allotted lands for which patents did not issue, and "school lands" which were unsurveyed or surveyed after withdrawal of the land pursuant to Executive Order, are subject to Hopi claims.

The Court finds that in order to meet the statutory criterion of "already located thereon", the occupation, possession, and use by Hopi Indians must be substantial and sufficiently intensive in order to create a property interest in the 1934 Reservation. Use by a few isolated individuals, especially when away from traditional use areas of that individual's Tribe, and irregular or sporadic uses are not sufficient. Substantial seasonal use is sufficient for this Court to find occupation or use of the land.

The gathering of eagles, visitation of shrines, and gathering plants and animals for religious purposes do not give rise to a property right under the 1934 Act. The Hopi Tribe's privilege of access to such shrines is protected by 25 U.S.C. § 640d–20.

■ The burden of proof is on the Hopi Tribe to demonstrate where Hopi Indians were "located" in 1934, although less stringent than in ordinary civil proceedings, due to the passage of more than fifty years between the events to be proved and trial and the lack of a written Hopi language. *See United States v. State of Washington,* 730 F.2d 1314, 1317 (9th Cir.1984) (standard of proof relaxed when little documentation is available for proving the existence of Indian fishing grounds).

After the areas on which Hopi Indians are located are identified, "Navajo interests are identifiable as the residue." *Sekaquaptewa II,* 619 F.2d at 808. Thus, this Court need only address Navajo use of lands on which the Hopi Tribe has proved Hopis were "located" in 1934, in order to decide whether Hopis were "exclusively" or "jointly" located on that land.

The Hopi Tribe, for the use and benefit of its individual members, and subject to the paramount title of the United States, is entitled to an exclusive interest in both the surface and subsurface estate in those lands which were exclusively used, occupied, or possessed by Hopis in 1934.

The Hopi Indians were exclusively located in the following area: (1) the Village of Moenkopi, (2) Moenkopi Wash/Kerley Valley in the areas designated as upstream from the present Highway 264 bridge, downstream from the present Highway 264 bridge (except Navajo patented allotments), and south of the Wash between Moenkopi and the "old Hopi bridge" at the western end of Kerley Valley, (3) the grazing areas south and southeast of Moenkopi (south of the Wash), (4) Reservoir Canyon, and (5) the central/southern Moenkopi Plateau to the southern border of the claimed Hopi exclusive use area, marked on Exhibit 703A (and not including the Bakalo or Little Bakalo). The specific areas are detailed in the Findings, above, and a map is attached depicting these areas.[163]

Upon completion of a survey of the exclusive Hopi lands by a competent surveyor appointed by the Court or by stipulation of the parties, and upon the Court's approval of that survey, title to the lands so identified shall be quieted in the Hopi Tribe, subject to the trust title of the United States, and all such lands shall be a part of the Hopi Reservation.

Pursuant to 25 U.S.C. § 640d–16, nothing in this action affects the title, possession, and enjoyment of lands heretofore allotted and patented to individual Indians. Any Navajo individuals residing on such allotments within the area determined to be exclusively Hopi (or within that area partitioned to the Hopi Tribe in later proceedings) shall be subject to the jurisdiction of the Hopi Tribe. Similarly, any Hopi individuals residing on such allotments within the area determined to be exclusively Navajo (or within the area partitioned to the Navajo Nation in later proceedings) shall be subject to the jurisdiction of the Navajo Nation.

**163.** The attached map is not intended to reflect the precise boundaries of the exclusive and joint use areas.

The lands jointly used by Navajos and Hopis in 1934 are subject to partition in the second phase of trial proceedings. Navajo and Hopi Indians were jointly located in the following areas: (1) Moenkopi Wash/Kerley Valley in the areas designated as north of the Wash and south of the old Tuba City–Cameron road, between the government farm on the east and the old Hopi bridge on the west, and north of the old Tuba City–Cameron road, (2) the grazing areas east of Moenkopi (north of the Wash), (3) Pasture Canyon, (4) southern Moenkopi Plateau, south of the Hopi exclusive area border, depicted on Ex. 703A, throughout Buck Pasture to Hukvahklo, (5) the Bakalo, (6) Coal Mine Mesa, (7) Ward Terrace, and (8) the western and northern Moenkopi Plateau. The specific areas are detailed in the Findings, above, and a map is attached depicting these areas.[164]

The Navajo Nation, subject to Paiute claims, and for the use and benefit of its individual members, has an exclusive interest in both the surface and subsurface estate of lands, subject to the paramount title of the United States, outside the Hopi exclusive area and not subject to partition.

In the partition phase of these proceedings, the Court will receive and consider all relevant evidence, and enter findings and conclusions, relating to division of property found to be jointly occupied in 1934.

---

**164.** The attached map is not intended to reflect the precise boundaries of the exclusive and joint use areas.

Border of Hopi use area in 1934
Hopi exclusive use area in 1934
Hopi-Navajo joint use area in 1934

## ORDER AMENDING FINDINGS OF FACT

On April 27, 1992, this Court issued Findings of Fact and Conclusions of Law

1. This reservation was created by the Act of June 14, 1934, 48 Stat. 960 (1934) ("the 1934

("Findings") regarding Hopi claims to the 1934 Reservation.[1]  On May 22, 1992, the Hopi Tribe and Navajo Nation filed simultaneous briefs and maps regarding their

Act").  The 1934 Act described the external boundaries of the Navajo Reservation, and con-

interpretations of the Court's Findings with regard to specific boundaries for the area found to have been exclusively used by Hopis in 1934 and the area found to have been exclusively used by Hopis in 1934 and the area jointly used by Navajos and Hopis in 1934.[2] Although this Order will not delineate the specific boundaries for the "exclusive" and "joint use" areas, the Order will address the few areas in which there were wide differences between the Hopi and Navajo interpretations in order to narrow the issues for trial. These areas include: (1) the area between Ward Terrace, Highway 89, and the Little Colorado River, (2) southern Ward Terrace, and (3) the Moenkopi Plateau south of Buck Pasture and Hukvahklo (Windy Tank).

(1) *The area between Ward Terrace, Highway 89 and the Little Colorado River*

In its interpretation of the Court's Findings regarding grazing on Ward Terrace, the Hopi Tribe included an area bounded by Ward Terrace on the east, Highway 89 to Cameron on the west, and the Little Colorado River on the southwest. In support of

this interpretation, the Hopis reference a footnote in which the Court summarized Hopi testimony that Hopi cattle grazed near Cameron and to the Little Colorado River.[3] However, this evidence is not sufficient to demonstrate substantial Hopi use of the area,[4] and the Court will exclude it from the area to be partitioned.

(2) *Southern Ward Terrace*

The Court concluded that Hopis and Navajos jointly grazed "throughout the Ward Terrace area in 1934", but did not specify the southern boundary of this area. The Hopis contend that this joint grazing area should extend across the entire Ward Terrace geographic area,[5] which extends to a line approximately parallel to the northern boundary of Wupatki National Monument. The Navajos argue for a much more limited area, following the boundaries on Ex. 703A, Hopi expert Dr. Adam's claimed "exclusive use" area map.

The Court finds that Hopis grazed on Ward Terrace south to a line parallel with the southern boundary depicted on Ex. 703A.[6] The area south of this boundary

---

veyed an equitable interest in certain of these lands to the Navajo Nation and "such other Indians as may already be located thereon", including Hopi Indians.

2. The area jointly used by Hopis and Navajos in 1934 is subject to partition in "Phase II" of these proceedings; the area exclusively used by the Hopi Tribe in 1934 will become part of the Hopi Reservation when specific boundaries are established. *See* 25 U.S.C. § 640d–7(b).

3. Roger Honahni testified at deposition that a number of Hopis grazed on Ward Terrace and in the area "near Cameron", Ira Naseyouma testified at deposition that Hopi livestock grazed to Highway 89 and to the Little Colorado River, and James Humetewa testified at deposition that his cattle would go to the Little Colorado if they could not find water. (Findings, p. 1515, note 78). Of the three, only James Humetewa personally grazed his cattle in this area in 1934; his testimony established that the cattle grazed to the Little Colorado only if short on water. Further, the map drawn by Humetewa at deposition (Ex. 732A) excludes the area between Ward Terrace and Highway 89, Cameron, and the Little Colorado River. Moreover, there is no documentation of Hopi use of this area. Hopi use of this area was therefore not substantial enough to create a property interest.

4. This Court concluded:

[O]ccupation, possession, and use by Hopi Indians must be substantial and sufficiently intensive in order to create a property interest in the 1934 Reservation. Use by a few isolated individuals, especially when away from traditional use areas of that individual's Tribe, and irregular or sporadic uses are not sufficient. Substantial seasonal use is sufficient for this Court to find occupation or use of the land.

(Findings, p. 1531).

5. To demonstrate the extent of Ward Terrace, the Hopi Tribe attached a map on which Harold G. Bassett, Chief of the Technical Planning Section of the Rocky Mountain Mapping Center of the United States Geological Survey, had circled specific geographic features used for purposes of map labeling. (Ex. 3 to Hopi brief).

6. The Hopi Tribe introduced the deposition testimony of Roger Honahni, William Numkena, Ira Naseyouma, and James Humetewa, summarized in the Court's Findings at p. 1515, note 78.

Roger Honahni testified that a number of Hopis grazed in the area "near Cameron", but did not know how far south the cattle in this area went; Honahni did not specify what "near Cameron" meant. 3 TT 361–364.

will be excluded from the area to be partitioned. This Order does not establish the northern or western boundaries of the area jointly grazed on Ward Terrace. Ward Terrace is bounded on the east by the escarpment of the Moenkopi Plateau.

(3) *The Moenkopi Plateau south of Buck Pasture and Hukvahklo (Windy Tank)*

The Court found that Hopis grazed on the southern Moenkopi Plateau, throughout Buck Pasture to Hukvahklo. In its map interpreting the Court's Findings, the Hopis included the area south of Hukvahklo to the southern end of the Moenkopi Plateau, arguing that there was no physical obstruction to Hopi livestock grazing past Hukvahklo. However, only one Hopi witness testified that Hopi livestock grazed past Hukvahklo to Sand Springs on the 1882 Reservation,[7] and no other evidence supports substantial grazing in this area. Thus, the Court finds that the joint use area did not extend past Hukvahklo.

Accordingly,

IT IS ORDERED that (1) the area between Ward Terrace, Highway 89, and the Little Colorado River, (2) Ward Terrace south of the southern boundary depicted on Ex. 703A, and (3) the Moenkopi Plateau south of Buck Pasture and Hukvahklo

(Windy Tank), are excluded from the area jointly used by Navajos and Hopis in 1934.

---

Ira Naseyouma testified that the Dallas brothers built a house and two dams south of Secuva (a spring on Ward Terrace). However, his estimates of distance were greatly exaggerated and contradictory, and he was not consistent regarding which dam was built first, nor on their direction from the house. He also testified that the Hopi cattle grazed to Lowava (Lawava) (an area which the Hopi Tribe places south of Hukvahklo, on the escarpment of the Moenkopi Plateau). 10 TT 1626–33, 11 TT 1662–67.

James Humetewa testified that he and the other members of the Dallas/Humetewa outfit grazed far south on Ward Terrace to an area east of Black Point, as depicted on a map drawn in his deposition (Ex. 732A). 6 TT 1022–29.

None of this testimony demonstrates the intensity of grazing on southern Ward Terrace. The evidence supports substantial grazing in the area around Hopi Site 83, including Secuva and Waawala. However, there is no evidence to support the finding that grazing south of this area was more than infrequent.

The Hopi outfit grazing in this area owned between 129 and 300 cattle. 6 TT 1022–29 (Deposition of J. Humetewa) (owned 129 cattle and

four horses); 10 TT 1626, 1631 (Deposition of I. Naseyouma) (Dallas brothers and Humetewa brothers owned 300 cattle "all together"); Ex. 451 at 3 (Page, *Stock Ownership–Moencopi Village,* 4/15/37) (Lomavitu list) (Hopis from Moenkopi owned 403 cattle in 1937; the Dallas group owned 55 cattle, James, Henry, and Alex "Humitewa" owned 66 cattle). The Dallas and Humetewa brothers grazed their cattle in other areas, as well, and 129–300 cattle could not have intensively used the entire Ward Terrace. Thus, this Court finds that the southern boundary is parallel to the southern boundary on Ex. 703A.

7. James Humetewa testified that a number of Hopis grazed from the Moenkopi Plateau to Sand Springs. However, the testimony was not specific and did not establish the intensity of grazing south of Hukvahklo. Neither Roger Honahni nor William Numkena testified that grazing occurred past Hukvahklo, and Ira Naseyouma's testimony regarding a corral south of Buck Pasture was not corroborated by archeological remains, and was otherwise not credible. (Findings, p. 1521, note 106).